UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MIRROR WORLDS TECHNOLOGIES, LLC,

       Plaintiff,

v.

FACEBOOK, INC.,

       Defendant.

Civil Action No. 1:17-cv-3473 (JGK)

**DEFENDANT FACEBOOK, INC.'S MEMORANDUM OF LAW IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE <u>EXPERT OPINIONS OF JIM W. BERGMAN</u>**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ............................................................................................................ 1

II. BACKGROUND .............................................................................................................. 3

III. LEGAL STANDARD ....................................................................................................... 3

IV. ARGUMENT .................................................................................................................... 4

    A. Mr. Bergman's "Cost Savings" Calculation is Irrelevant, Not Tethered to the Facts of the Case, and Must Be Excluded. .......................................... 4

    B. Mr. Bergman's Application of a "45:55 Split" Is Arbitrary and Unfounded. ............................................................................................................ 10

    C. Mr. Bergman's Opinions Regarding "Increased Profits" and Other "Derivative Benefits" are Unfounded and Unreliable. ......................................... 13

V. CONCLUSION ............................................................................................................... 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002).................................................................................................3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)..................................................................................................3, 14

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018)...........................................................................................13

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)..................................................................................................13, 14

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010).....................................................................................4, 11, 12

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)......................................................................................4, 13

*VirnetX, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014)......................................................................................3, 13

**Statutes**

35 U.S.C. § 284..............................................................................................................8

**Other Authorities**

Fed. R. Evid. 702 ........................................................................................................1, 3

I.        **INTRODUCTION**

Facebook moves to exclude the opinions offered by Jim Bergman, the damages expert retained by plaintiff Mirror Worlds, under Fed. R. Evid. 702 and *Daubert*. Mr. Bergman claims that Facebook owes $159 million in damages for alleged infringement of the asserted claims. This calculation is based on the notion that the accused Facebook systems obtained a performance boost by allegedly using the patented techniques, resulting in a cost savings to Facebook.

The basis of Mr. Bergman's calculation was an opinion from the technical expert retained by Mirror Worlds, Dr. Eric Koskinen, who offered a performance degradation analysis comparing two different hypothetical database configurations for storing timestamp data. Dr. Koskinen concluded that the first configuration (which he dubbed "**Tier 1**") – which he claimed was consistent with the way Facebook stores its data – performed 30.85% faster than a second configuration (which he dubbed "**Tier 2**"). Facebook is separately moving to exclude Dr. Koskinen's analysis under *Daubert* because it is unreliable and untethered to the facts of the case.

But even if the Court were to find that Dr. Koskinen's performance degradation analysis passed muster under *Daubert*, Mr. Bergman's opinions misapply Dr. Koskinen's analysis in a way that renders those opinions irrelevant and unreliable. Critically, Mr. Bergman's analysis requires that Dr. Koskinen's "**Tier 1**" and "**Tier 2**" configurations represent, respectively, infringing and non-infringing ways of storing data. Mr. Bergman's entire calculation is premised on the idea that (a) the "Tier 2" configuration represents a non-infringing alternative to the asserted patents, and (b) if Facebook adopted that non-infringing configuration, it would suffer the above-stated 30.85% performance degradation. By avoiding that degradation by infringing the asserted patents, Mr. Bergman argues, Facebook achieved a cost savings he calculated at $159 million. His analysis, in other words, requires that a "Tier 2" configuration represent an alternative that avoids infringement of the asserted claims.

1

But there is zero evidence to support this. Mr. Bergman appears to have assumed from his discussions with Dr. Koskinen that a Tier 2 configuration would avoid infringement, but when asked at his deposition, Dr. Koskinen declined to offer any such opinion. Dr. Koskinen's position is not surprising, as the asserted claims do not recite limitations based on how timestamp data is physically stored. The differences between Dr. Koskinen's hypothetical "**Tier 1**" and "**Tier 2**" configurations have no connection to the asserted claims, and thus, Mr. Bergman's damages model does not provide a reliable measure of damages attributable to the alleged infringement.

And even if Mirror Worlds could overcome this fundamental problem, Mr. Bergman's damages opinion should be excluded for another reason – the critical "profit split" step in his analysis is also flawed. In the last step of his damages calculation, Mr. Bergman splits the alleged cost savings he calculated by awarding 45% to Mirror Worlds and 55% to Facebook. But this "45:55 split" was not the result of any sound methodology or analysis. He attempted to support his arbitrary split by pointing to certain reseller and content creator agreements that have no connection to this case. Mr. Bergman admitted that he has not even seen or reviewed the content creator agreements, and that he possesses no relevant information about them. Both categories of agreements are fundamentally dissimilar to the patent license that would result from a hypothetical negotiation. Mr. Bergman's reliance on these agreements to support his proffered 45:55 split amounts to nothing more than a disguised use of an improper "rule of thumb" – an arbitrary approach to calculating damages that has been repeatedly rejected by the Federal Circuit.

A final flaw in Mr. Bergman's opinions warrants their exclusion. Mr. Bergman opines – without support – that Facebook receives "derivative benefits" and "increased profits" as a result of its alleged infringement of the asserted patents. Mr. Bergman provides no factual, technical or other support for these opinions; they are nothing more than conclusory *ipse dixit*.

## II.     BACKGROUND

Mirror Worlds filed its complaint on May 9, 2017, alleging infringement of U.S. Patent Nos. 6,006,227 (the "'227 patent"), 7,865,538 (the "'538 patent") and 8,255,439 (the "'439 patent"). Mirror Worlds served the expert report of its damages expert, Jim Bergman, on December 22, 2020 ("Bergman Rpt."). On the same day, Mirror Worlds served the opening report of its technical expert, Eric Koskinen, Ph.D. ("Koskinen Op. Rpt."), regarding alleged infringement. Dr. Koskinen's report also contained technical analysis about purported benefits of the patented technology on which Mr. Bergman relied for certain of his theories.

## III.    LEGAL STANDARD

"The admissibility of expert testimony is governed by the Federal Rules of Evidence and the principles laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). Expert testimony is admissible only if it is both relevant and reliable. *Daubert*, 509 U.S. at 589. The testimony must be "based on sufficient facts or data," and must be the "product of reliable principles and methods … reliably applied … to the facts of the case." Fed. R. Evid. 702. Accordingly, expert testimony that amounts to nothing "more than subjective belief or unsupported speculation[,]" or that is not "sufficiently tied to the facts of the case[,]" must be excluded. *Daubert*, 509 U.S. at 590-91. "[T]he Supreme Court has made clear that the district court has a 'gatekeeping' function under Rule 702—it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (citation omitted); *see also, e.g., Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (citation omitted).)

3

The Federal Circuit has repeatedly applied *Daubert* to uphold the exclusion of reasonable royalty calculations that are not sufficiently tied to the facts of the case. "To be admissible, expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)). The patentee bears the burden of proving damages and must show that proffered expert damages testimony is sufficiently tied to the facts of the case. *Uniloc*, 632 F.3d at 1315.

## IV.    ARGUMENT

### A.    Mr. Bergman's "Cost Savings" Calculation is Irrelevant, Not Tethered to the Facts of the Case, and Must Be Excluded.

As noted, Mr. Bergman's damages analysis revolves around alleged "cost savings" that Facebook supposedly achieved through its alleged infringement of the asserted patents. He argues that Facebook's infringement enabled it to significantly increase the performance of its accused News Feed and Timeline systems. Because Mr. Bergman does not serve as a technical expert, he looked to Mirror Worlds' technical expert, Dr. Koskinen, to analyze and quantify this alleged performance difference. Dr. Koskinen in turn determined that the difference was 30.85% – which provides the essential input into Mr. Bergman's cost savings analysis.

Facebook is separately moving under *Daubert* to exclude Dr. Koskinen's opinions about the alleged performance differences. But the outcome of the present motion does not depend on the Court excluding Dr. Koskinen's opinions under *Daubert*. As explained below, this motion addresses flaws with Mr. Bergman's application of Dr. Koskinen's analysis that exist independently of the problems with Dr. Koskinen's analysis.

The concurrently-filed *Daubert* against Dr. Koskinen explains in great detail the methodology that Dr. Koskinen employed to come up with the proffered 30.85% difference, and

4

for purposes of this motion, only a brief summary of that methodology is required. As the Court is aware, the asserted patents are directed to a technique for storing information in a "time-ordered" manner. Dr. Koskinen thus sought to show that a storage system that stores information ***with*** its associated timestamp information will achieve better performance than a system that stores information ***separately*** from its timestamp information.

Dr. Koskinen posits two hypothetical database configurations to test his hypothesis, which he coined "**Tier 1**" and "**Tier 2**." Both hypothetical configurations are based on relational database techniques that store information in "tables." Under a **Tier 1** configuration, hypothetically, a single database table stores information and its associated timestamps. But under a **Tier 2** configuration, timestamp information is relegated to a second database table, thus requiring that at least two database tables be accessed to obtain information and its associated timestamp. (*See, e.g.*, Facebook's Memorandum of Law in Support of *Daubert* Motion to Exclude Certain Opinions of Eric Koskinen, Ph.D. at Section III.A (filed concurrently herewith).) Dr. Koskinen concluded (by relying on third party test results of unrelated databases) that Tier 1 had a clear performance advantage over Tier 2; he estimated that if Facebook employed a Tier 2 configuration instead of Tier 1, Facebook would suffer a performance degradation of at least 30.85%.

The flaws with Dr. Koskinen's analysis are detailed in the concurrently-filed *Daubert* motion directed at those opinions. The *Daubert* problems here stem independently from Mr. Bergman's misapplication of Dr. Koskinen's performance degradation analysis, *i.e.*, by assuming the 30.85% performance degradation figure would be avoided by not infringing the patents. Citing a December 20, 2020 conversation he had with Dr. Koskinen, Mr. Bergman wrote:

> It is my understanding Dr. Koskinen has performed an analysis where he calculated that, but-for Facebook's access to the patents-in-suit, Facebook would experience a minimum 30.85% degradation in queries per second and that, in general, this would require a

5

> similar increase in servers and power to reach the same performance.

(Bergman Rpt., ¶155, Keefe Ex. 1; *see also id.*, ¶138 ("To compensate for this degradation, it is my understanding Facebook would have been required to obtain significantly more technical resources, including CPUs, memory, and the additional infrastructure necessary to support those components.").) As noted, this performance "degradation" was based on Dr. Koskinen's comparison of the hypothetically infringing "Tier 1" versus the hypothetical and supposedly non-infringing "Tier 2" configurations.

There is nothing inherently wrong using a basic "but-for" cost savings framework. The "but-for" analysis essentially asks, "what would have been the impact if Facebook could not infringe the asserted patents?" The answer in this case, according to Mirror Worlds, is that Facebook would have had to transition its systems from a "Tier 1" to a "Tier 2" configuration, thus resulting in the proffered 30.85% performance degradation and the ensuing increased costs noted above. But this cost savings analysis has a critical requirement. In order for the 30.85% performance degradation to have any relevance to the measure of damages, the less efficient "**Tier 2**" alternative has to provide a non-infringing alternative to the asserted patents. This makes logical sense – if not infringing the asserted patents would require Facebook to adopt a "Tier 2" configuration, the additional costs associated with that configuration could provide some guidance on a proper measure of damages.

This assumption is directly stated in Mr. Bergman's analysis when he explains that "all else equal, without the patented technology, Facebook's system would suffer a 30.85% degradation in queries per second." (Bergman Rpt., ¶138 (emphasis added), Keefe Ex. 1; *see also id.* at ¶155.) Mr. Bergman explained at his deposition that, based on his understanding, the performance-degraded configuration analyzed by Dr. Koskinen did represent a non-infringing

6

alternative to the asserted patents. (3/24/2021 Bergman Depo., 64:6-10, Keefe Ex. 2 ("Q. And Dr. Koskinen conveyed to you that the alternative that's being discussed here in Paragraph 138, was not infringing the Mirror Worlds' patents, correct? A. I believe that's right.").) But this is precisely the point at which Mr. Bergman's cost savings analysis collapses.

There is <u>zero</u> evidence in the record that the proffered "Tier 2" configuration actually presents a non-infringing alternative to the asserted patents. Mr. Bergman offered no such opinions, which is unsurprising as he relied on Dr. Koskinen for all technical aspects of his opinions. But Dr. Koskinen likewise did not opine that "Tier 2" presented a non-infringing alternative. His expert report provides no such opinion; if anything, he appears to argue that non-infringing alternatives to the Mirror Worlds patents simply do not exist. (*See* Koskinen Op. Rpt., ¶458, Keefe Ex. 4 (concluding that there are no acceptable non-infringing alternatives to the Mirror Worlds patents).) During his deposition, Dr. Koskinen repeatedly attempted to duck the question of whether "Tier 2" presents a non-infringing alternative, but ultimately responded that he did not know either way. (3/25/2021 Koskinen Depo., 143:11-145:19, Keefe Ex. 3 (repeatedly evading the question but ultimately stating, "I guess I would need to think about it and inform an opinion."); *see also id.* at 146:22-147:2 ("Q. Okay. So sitting here today, you wouldn't be confident saying that if Facebook went to Tier II for Facebook News Feed and Timeline, that they'd get out of infringement. You're not prepared to say that; correct? A. I'm not sure.").) That Dr. Koskinen declined to offer an opinion that Tier 2 provides a non-infringing alternative was unsurprising because, as demonstrated below, the claim language itself confirms that it does not.

This lack of evidence that "Tier 2" creates a non-infringing alternative creates a gaping hole in Mr. Bergman's cost savings theory that cannot be remedied with cross examination or anything else. There is no relevance to Mr. Bergman's "but-for" cost savings analysis unless it

7

involves a comparison of an allegedly infringing system (*i.e.* "Tier 1") against a system that does not infringe (*i.e.* "Tier 2"). After all, if both the preferred "Tier 1" and the performance-degraded "Tier 2" configurations still infringe the asserted patents, the degraded performance of "Tier 2" tells us nothing about how a Facebook "Tier 2" system would perform "without the patented technology" (Bergman Rpt., ¶138 (underlining added), Keefe Ex. 1), thus undermining the key assumption of Mirror Worlds' theory. The costs savings Facebook obtained by avoiding that supposedly degraded "Tier 2" configuration, in turn, would not provide a reliable measurement of "the use made of the invention by the infringer . . . ." 35 U.S.C. § 284 (emphasis added).

Not only has Mirror Worlds offered no analysis or opinions that "Tier 2" provides a non-infringing alternative, but the plain language of the asserted claims confirms that the distinctions between "Tier 1" and "Tier 2" configurations are irrelevant to the presence or absence of infringement. Dr. Koskinen's hypothetical "Tier 1" and "Tier 2" configurations, as noted, differ only with respect to how they physically store time-related data in a database; "Tier 1" stores data and its associated timestamp in a single database table whereas "Tier 2" stores the data and timestamps in at least two separate database tables. But the claims do not recite any limitations making this distinction meaningful in any way. The claims are agnostic as to how timestamps are physically stored in relationship to their corresponding data – they merely require that the data and its timestamp be associated in some unspecified way.

For example, claim 13 of the '227 patent recites "selecting a timestamp to identify each data unit," and then simply "associating each data unit with at least one chronological indicator having the respective timestamp." ('227, 16:18-23 (Claim 13), (emphasis added), Keefe Ex. 5.) Nothing in the claim recites a database, database tables, let alone any limitations requiring that the time stamp and its associated data unit be physically stored in the same table or arranged in any

8

particular manner.

The same is true for the other two asserted patents which, if anything, say even less about storage of timestamps (which they refer to as "time indicators"). For example, claim 1 of the '538 patent merely recites "stor[ing] the provided documents as a time-ordered main stream of documents <u>associated with respective automatically generated time indicators</u>." ('538, 16:27-29, (emphasis added), Keefe Ex. 6.) Claim 1 of the '439 patent similarly recites that stored document representations "includ[e] respective automatically generated <u>time indicators associated with the documents</u> corresponding to said representations." ('439, 16:47-50, (Claim 1), (emphasis added), Keefe Ex. 7.) As with the '227 patent, these claims merely require an association between time indicators and their corresponding documents, and impose no requirements with respect to how or where time indicators and their corresponding documents have to be physically stored in relationship to one another in the main stream/collection.

Accordingly, the storage differences between "Tier 1" and "Tier 2" configurations are irrelevant to the presence or absence of infringement of the asserted claims. While the damages theory espoused by Mirror Worlds is premised on "Tier 1" being infringing and "Tier 2" being non-infringing, because the differences in those approaches have no bearing on the claim limitations the exact opposite could just as easily be true – one could just as easily build a <u>non-infringing</u> system using the preferred "Tier 1" approach, and an <u>infringing</u> system using the performance-degraded "Tier 2" approach. In any case, the performance differences between "Tier 1" and "Tier 2" provide no guidance about "the but-for impact on Facebook's costs without the patented technology." (Bergman Rpt., ¶140, Keefe Ex. 1.) Mr. Bergman's cost savings analysis, which is integral to all of his opinions about damages, must therefore be excluded under *Daubert*.

9

### B. Mr. Bergman's Application of a "45:55 Split" Is Arbitrary and Unfounded.

The final step of Mr. Bergman's damages calculation "splits" the cost savings he calculated, giving 45% to Mirror Worlds and 55% to Facebook. (*See, e.g.,* Bergman Rpt., ¶268, Keefe Ex. 1.) In other words, he takes the entire purported cost savings he calculated using Dr. Koskinen's 30.85% performance degradation input, and awards nearly half of it to Mirror Worlds as damages. This 45:55 split presents separate problems under *Daubert*. Mr. Bergman attempts to justify this split by pointing to (a) certain reseller agreements and (b) certain content creator agreements, but those agreements are irrelevant and have no connection to the facts of this case.

The reseller agreements relied upon by Mr. Bergman were entered into in the early 2000s between Mirror Worlds Technologies, Inc. (a prior owner of the asserted patents) and various resellers engaged in selling Mirror Worlds Technologies, Inc.'s software products. But as Mr. Bergman acknowledges, none of these reseller agreements were patent license agreements. (3/24/2021 Bergman Depo., 129:17-130:1, Keefe Ex. 2.) The reseller agreements instead gave "discounts to Mirror Worlds software… depending on the overall volume associated with a sale." (Bergman Rpt., ¶264, Keefe Ex. 1.) Mr. Bergman relies on these sales volume discounts as a basis for his 45:55 split opinion, but he does not – and cannot – explain how these volume discounts have any bearing on the deal that would have been struck as a result of the hypothetical patent license negotiation at issue for the damages analysis in this case. And even assuming Mirror Worlds could explain how these reseller agreements were relevant to patent damages, Mr. Bergman provides no opinion or analysis regarding factors that may have impacted the terms of the reseller agreements, such as the market for the software subject to the reseller agreements, the relative bargaining positions of the parties to those agreements, industry practices for software reseller agreements, and the like. Mr. Bergman instead assumes – without support or justification – that software sales volume discounts agreed to by sellers of Mirror Worlds software

a decade earlier would set the standard for the "split" of the purported cost savings during the hypothetical license negotiation with Facebook. *See, e.g.*, *ResQNet.com, Inc.*, 594 F.3d at 870-72 (rejecting reliance on software licenses because where there was an uncertain link between the software licenses and the claimed invention, and insufficient information to adequately evaluate their probative value). Mr. Bergman's reliance on these agreements fails under *Daubert*.

Mr. Bergman's reliance on content creator agreements is similarly flawed. He relies on news articles referencing agreements in which Facebook, YouTube and Google may potentially share advertising revenue with content creators (*e.g.*, video creators). (*See* Bergman Rpt., ¶¶265-266, Keefe Ex. 1.) But Mr. Bergman did not review these agreements. (3/24/2021 Bergman Depo., 130:8-11, Keefe Ex. 2 (admitting he did not review the Facebook agreements); *id.* at 130:19-23 (admitting he did not review the YouTube agreements); *id.* at 132:1-5 (admitting he did not review the Google agreements); *id.* at 132:9-13 (same).) Mr. Bergman does not explain how these alleged revenue sharing arrangements have any technological or economic relationship to the asserted patents. Mr. Bergman does not know whether these agreements include patent licenses – though he acknowledged it is doubtful that they do. (3/24/2021 Bergman Depo., 130:12-15, Keefe Ex. 2 ("Q. Do you know if those agreements included any license to any patents? A. I don't believe so. I would be surprised if they did."); *see also, e.g.*, *id.* at 130:24-131:2 (admitting he doesn't know if the YouTube agreements conveyed patent rights); *id.* at 132:6-8 (same re: Google agreements).) Mr. Bergman has little if any knowledge about the content creator agreements, but nevertheless points to the advertising revenue splits that he believes these agreements include as somehow supporting his 45:55 split opinion.

Because Mr. Bergman relied solely on news articles referencing these agreements, and not on the agreements themselves, their actual terms are not in the record. There is no way to

11

determine if the revenue splits described in the news articles relied on by Mr. Bergman actually reflect the economic reality of the underlying agreements. These purported advertising revenue splits, for example, could be accompanied by additional terms that provide consideration to the parties beyond the purported advertising revenue split – *e.g.*, balancing payments or offsets, advertising credits and incentives, preferences in distribution of content – and potentially many other forms of consideration not reported in the news articles. Without actually reviewing the agreements, there is simply no way for Mr. Bergman to obtain a fulsome or accurate picture of the financial and economic landscape of the agreements. To the extent Mr. Bergman intended to rely on these agreements, it was incumbent on Mirror Worlds to seek them through discovery or third-party subpoenas so that their actual terms could be reviewed and analyzed. But Mirror Worlds failed to do so, leaving Mr. Bergman with no facts on the actual terms of the agreements. Mr. Bergman's reliance on the agreements therefore is unreliable and subject to exclusion under *Daubert*.

Although both categories of agreements (*i.e.* the reseller agreements and the content creator agreements) raise their own separate issues as discussed above, they share one overarching *Daubert* problem – they have "no relationship to the claimed invention[,]" *ResQNet.com, Inc.,* 594 F.3d at 870, and thus provide no meaningful guidance on the cost savings division that would have resulted from the hypothetical patent licensing negotiation between Facebook and Mirror Worlds. The Federal Circuit has explained that a damages expert "must consider licenses that are commensurate with what the defendant has appropriated. If not, a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question." *Id.* at 872. This is essentially what Mr. Bergman did here, except that instead of using "conveniently selected licenses," *id.*, he relied on

12

agreements that are not even licenses. As such, there is "simply too great an analytical gap" between the proposed 45:55 split, the facts he uses to support it, and the technology in question. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Uniloc*, 632 F.3d at 1315 ("If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded.").

Mr. Bergman's reliance on clearly inapposite agreements is an attempt to end run around Federal Circuit precedent condemning damages theories that adopted similarly arbitrary percentages that were not tied to the facts of the case. *See, e.g., VirnetX*, 767 F.3d at 1332-34 (rejecting use of the Nash Bargaining Solution to rely on a 45:55 split of profits because it "assumed the same … royalty split regardless of the … value of the patented technology[,]" made "too crude a generalization about a vastly more complicated world[,]" and was "insufficiently tied to the facts of the case . . . ."); *see also, e.g., Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC,* 879 F.3d 1332, 1349 (Fed. Cir. 2018). Because Mr. Bergman's cost savings split is "insufficiently tied to the facts of the case," *VirnetX*, 767 F.3d at 1334, it must be excluded, along with any calculation of damages that relies on it.

### C. Mr. Bergman's Opinions Regarding "Increased Profits" and Other "Derivative Benefits" are Unfounded and Unreliable.

Mr. Bergman opines that the Mirror Worlds patents "provide[] benefits to the Facebook through the expansion of its ecosystem, resulting in additional Facebook users, higher user engagement, and increased advertising revenue." (Bergman Rpt., ¶225, Keefe Ex. 1; *see also id*., ¶136 ("Facebook also receives significant derivative benefits from use of the patented technology" including additional users, higher user engagement, and increased advertising revenue).) But these are nothing more than argument for which Mr. Bergman provides no support. He gives no reason why the accused <u>back-end</u> Facebook systems – which are not visible to Facebook users – would provide any increase in the user base, engagement, or advertising revenue. Nor is he technically

13

qualified to do so. Mr. Bergman includes no citation, provides no factual support, and points to no opinions from qualified technical experts to support his view. Mr. Bergman's opinions are conclusory *ipse dixit* that must be excluded. *See Gen. Elec.*, 522 U.S. at 146; *Daubert*, 509 U.S. at 590-91 (opinions that are nothing "more than subjective belief" and "unsupported speculation" not "sufficiently tied to the facts of the case" must be excluded).

## V.     CONCLUSION

Facebook respectfully requests that Mr. Bergman's damages calculation be excluded in its entirety. In addition, Facebook respectfully requests that Mr. Bergman's opinions regarding alleged increased profits and derivative benefits associated with Facebook's alleged infringement be excluded under *Daubert*.

Dated:  May 20, 2021                     By: */s/ Heidi L. Keefe*

Joseph Drayton  (NY 2875318)
COOLEY LLP
1114 Avenue of the Americas
New York, New York 10036-7798
Phone: (212) 479-6000
Facsimile: (212) 479-6275
jdrayton@cooley.com

Heidi L. Keefe (CA 178960) (*Pro Hac Vice*)
Mark Weinstein (CA 193043) (*Pro Hac Vice*)
Dena Chen (CA 286452) (*Pro Hac Vice)*
COOLEY LLP
3175 Hanover Street
Palo Alto, California 94304-1130
Phone:  (650)843-5000
Facsimile: (650)849-7400
hkeefe@cooley.com
mweinstein@cooley.com
dchen@cooley.com

Phillip E. Morton (VA 71299, DC 1032243) (*Pro Hac Vice)*
Emily Terrell (CA 234353; DC 1005446) (*Pro Hac Vice)*
Shane Hannon (DC 1671202) (*Pro Hac Vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC  20004
Phone:  (202) 842-7800
Fax:  (202) 842-7899
pmorton@cooley.com
eterrell@cooley.com
shannon@cooley.com

*Attorneys for Defendant Facebook, Inc.*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the Court's Individual Practices (dated May 28, 2020), containing 4,285 words, excluding the parts exempted by Section II.D. of the Court's Individual Practices.

>                     */s/ Heidi L. Keefe*
>                     Heidi L. Keefe

## **CERTIFICATE OF SERVICE**

I, Heidi L. Keefe, hereby certify that a true and correct copy of the foregoing document was served on counsel of record via ECF May 20, 2021.

*/s/ Heidi L. Keefe*
Heidi L. Keefe
