M2S5mirA

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MIRROR WORLDS TECHNOLOGIES,
     LLC,
 4
                    Plaintiff,              New York, N.Y.
 5
                v.                          17 Civ. 3473 (JGK)
 6
     FACEBOOK INC.,
 7
                    Defendant.
 8
     ------------------------------x
 9
                                            February 28, 2022
10                                          9:40 a.m.

11   Before:

12                       HON. JOHN G. KOELTL,

13                                          U.S. District Judge

14

15                          APPEARANCES

16

17
     RUSS, AUGUST & KABAT
18        Attorneys for Plaintiff
     BY:  MARC A. FENSTER
19        JACOB R. BUCZKO
          JAMES TSUEI
20        BENJAMIN T. WANG
              -and-
21   AMSTER, ROTHSTEIN & EBENSTEIN, LLC
     BY:  CHARLES R. MACEDO
22
     COOLEY, LLP
23        Attorneys for Defendant
     BY:  HEIDI L. KEEFE
24        PHILLIP E. MORTON

25
```

M2S5mirA

1          (Case called)

2          THE DEPUTY CLERK:  Will all parties please state who

3     they are for the record?

4          MR. FENSTER:  Good morning, your Honor.  This is Marc

5     Fenster for the plaintiff.  With me is James Tsuei to my right,

6     Mr. Benjamin Wang to my left, Jacob Buczko to my farther left,

7     and Charlie Macedo is in the back.  And, our client

8     representative John Greene is here as well.

9          THE COURT:  Good morning.

10         MS. KEEFE:  Good morning, your Honor.  Heidi Keefe on

11    behalf of Meta/Facebook.  With me is Phil Morton.  In the back

12    we have two representatives from the client; Michelle Woodhouse

13    and Kyanna Sabanoglu.

14         THE COURT:  Good morning, all.  Welcome back to the

15    courtroom.

16         This is Facebook's motion for summary judgment.  I

17    will listen to argument.  I am familiar with the papers.

18         MS. KEEFE:  Thank you, your Honor.  Would you prefer

19    that -- because 101 and non-infringement are so distinct, I

20    thought I would do them separately and then let the other side

21    respond in between, but I am happy to do it however your Honor

22    prefers.

23         THE COURT:  Actually, I would be pleased to just hear

24    your complete argument beginning with 101.  I have a couple of

25    questions with respect to claim construction.

M2S5mirA

1           MS. KEEFE:  Great.

2           THE COURT:  And then the motion directed to

3   non-infringement.

4           MS. KEEFE:  I would be happy to do so, your Honor.

5           THE COURT:  In terms of time, I don't really need a

6   lot of argument on 101 and claim construction, and much of it,

7   just as last time, would be on the issue of infringement or

8   non-infringement.

9           MS. KEEFE:  OK.  Great, your Honor.

10          In that case, your Honor, I will be brief on the issue

11   of 101.

12          Here, your Honor, we do believe that these patents are

13   ineligible and invalid under 101 because they're directed to

14   the abstract notion of organizing and storing information in a

15   time-ordered manner.  Now, I know that the bulk of the argument

16   by plaintiff is -- but this has already been dealt with.  This

17   has already been done by a District Court and by the PTAB.

18          The first thing I would like to point out is the

19   district court decision in Texas, the Judge there actually did

20   find that the patents were directed to an abstract idea.

21          THE COURT:  But the District Court decision was before

22   *Enfish*.

23          MS. KEEFE:  It was, your Honor, but in *Enfish*.

24          THE COURT:  The PTAB decision was after *Enfish*.

25          MS. KEEFE:  That's correct.

M2S5mirA

| | |
|---|---|
| 1 | THE COURT:  One of my questions is I respect both |
| 2 | parties in this case a great deal for their legal acumen, and |
| 3 | if Facebook thought that there was in fact a reasonable 101 |
| 4 | motion, why wouldn't it have raised it the first time? |
| 5 | MS. KEEFE:  I'm not sure what you mean by the first |
| 6 | time, your Honor. |
| 7 | THE COURT:  The last motion for summary judgment. |
| 8 | MS. KEEFE:  Because we hadn't gone all the way through |
| 9 | expert discovery on that issue.  We didn't have their expert |
| 10 | report saying what they were going to do with that issue. |
| 11 | THE COURT:  Whoa, whoa.  Whoa.  But this is a matter |
| 12 | of law, right? |
| 13 | MS. KEEFE:  Your Honor, on step one absolutely it is a |
| 14 | matter of law, and on step two I think it is as well, unless |
| 15 | the plaintiff -- patent owner -- tries to raise a question of |
| 16 | fact regarding whether or not something is routine and |
| 17 | conventional. |
| 18 | THE COURT:  OK. |
| 19 | MS. KEEFE:  I tend to find that that happens and so I |
| 20 | make sure that the record is complete and final before I bring |
| 21 | it to the Court's attention.  Here, they haven't actually come |
| 22 | forward with anything saying that what they're doing isn't |
| 23 | using a computer in its routine and conventional way.  In fact, |
| 24 | the specifications of all three patents specifically invoke |
| 25 | normal computers being used in their normal fashions over and |

M2S5mirA

1    over again.  We are told, for example, that the patent should

2    use the Windows X operating environment in order to display the

3    things that are going on within it, things of that nature.

4    Instead, the only true opposition is they try to argue that

5    this is somehow directed to a computer-only problem that solves

6    the computer.  But here, your Honor, what we have learned since

7    *Enfish* is it is not enough just to say I have got something

8    that works on the back end of the computer to be a

9    computer-related problem.  Instead, you actually have to make

10   the computer work better and it has to be in the claim.

11   Perhaps the single most instructive case, your Honor, is the

12   *Berkheimer* case.  *Berkheimer* came down after *Enfish*.

13   *Berkheimer* was about a patent directed to taking in

14   information, parsing it -- in other words, analyzing the

15   information that comes in -- using that parsing in order to set

16   up different object-oriented structures and store them in

17   different places in essentially a database.

18          The Court in that case actually found that claim 1 was

19   invalid under 101 because it was just moving information around

20   and using standard computers in their normal fashion, using

21   them to figure out what the information is and figure out where

22   to put it.  There were dependent claims in that case that were

23   found to be eligible because those dependent claims added a

24   limitation which said:  But don't store redundant data, that

25   will make the computer work faster.

M2S5mirA

```
 1                Here, none of the claims actually include in their

 2       claims any of the things that plaintiff has said somehow fix

 3       the computer.

 4                THE COURT:  Do you think that the claims here can be

 5       characterized as directed at improving computer functionality?

 6                MS. KEEFE:  Absolutely not, your Honor.  They're not

 7       improving --

 8                THE COURT:  Why not?

 9                MS. KEEFE:  They're not improving the way the computer

10       works, they're just improving, in their mind, the way this a

11       user thinks about how things are being stored.

12                THE COURT:  I thought that they are directed at

13       actually improving the way in which the computer stores and

14       produces information in a time-ordered treatment, unlike the

15       way in which computers stored and produced information prior to

16       the patent.

17                MS. KEEFE:  Again, no, your Honor.

18                THE COURT:  Hold on.  On its face that would appear to

19       be directed at improving computer functionality.

20                MS. KEEFE:  So again, your Honor, it doesn't improve

21       the computer in any way.  The computer doesn't behave

22       differently.  You are just putting the information in a

23       different place.  And I can show that perhaps best with a small

24       demonstration.  I know your Honor knows I like demonstrations.

25                THE COURT:  I like demonstrations a lot if they're
```

M2S5mirA

1    really relevant.

2            MS. KEEFE:  So what we have in the past is something

3    like a file cabinet system and the patent itself even says

4    that.  In the past you had file cabinets where, for example,

5    you would have holiday photos stored, financial records, maybe

6    even some things about family events.  All that the patent

7    says -- your Honor, may I use the bench right here?

8            THE COURT:  Right.  I like the cues better.

9            MS. KEEFE:  They're here too, your Honor, but they

10   don't come up until non-infringement.

11           THE COURT:  OK.

12           MS. KEEFE:  All the patent is saying is people aren't

13   able to always remember what the title is this that they gave

14   to that file.  It's not about whether the computer can find it,

15   it is about the fact that the person has a hard time

16   remembering what to ask the computer for.  So instead of making

17   the human remember the title, the patent says take all the

18   stuff that's inside of it and just go with the date.  So we

19   will parse out the file for December 25th, we have another one

20   for July 4th, and we have one for January 1st, and the computer

21   will just automatically put them in time order and that's

22   something that computers have done forever, putting something

23   in chron order, not a big deal, also something that all humans

24   do.  The computer then says, all right, I will do the same

25   thing, I will take the stuff out of the financial folder and I

M2S5mirA

will just shove those in along the way here so that I have got

my April 15th, April 16th, and finally I will use my last

folder which is family events; I have got an August date so we

will put that in here; March is a family dinner, we will put

that here; and for my birthday in October we go over here.

          We haven't changed the way the computer works at all.

We have just put them in a different place in the memory.  The

theory was that it would be easier for a user to find.  That's

all.  In fact, the '227 patent itself says that the only

potential attendant benefit -- this is in column 1 and it is

cited in the opposition brief -- is that you don't have to

superfluously put a name on it.  Your Honor, that's not in the

claim.  The claim never says don't name it.  The claim just

says take the stuff you already have, even if it has names, and

put them in this time order so that now you have got one big

stack that's in chron order but it is the exact same stuff that

was stored before, it is just stored in a different order.

          That's not improving the computer.  The only things

that the patent talks about that might have been improvement to

computers may be having less overhead because they don't have

to put a file name in, aren't in the claims.  Just like in

*Berkheimer*.  The thing that supposedly made the computer better

wasn't in the claim until the dependent claim.  Here, there is

no dependent claim to save it.

          THE COURT:  Am I right that you don't disagree that

M2S5mirA

1    *Enfish* stands for the proposition that a patent claim that is

2    directed toward improving computer functionality is eligible

3    for patent protection under the first step of *Alice*?

4             MS. KEEFE:  I agree that *Enfish* stands for the

5    proposition that you have to improve the way that the computer

6    works, not the way that a user perceives the computer to have

7    worked because just because a user thinks it is faster or it

8    might be more intuitive, does not change the way the computer

9    works and is not fundamental to the computer.

10            THE COURT:  OK.

11            MS. KEEFE:  In *Enfish* it was changing an entire way

12   that a referential database referred up to itself, it changed

13   all of that.  This doesn't change the way things are stored,

14   they're still stored in databases, it just changes whether it

15   is chron order or whether it is not.  And I would point your

16   Honor to the fact that their own -- one of their own inventors

17   agreed.  Their own inventor, when asked, *What were you trying*

18   *to solve with LifeStream's project* -- which is what became the

19   patent -- he said we were trying to solve an information

20   management problem -- a very human problem, not a computer

21   problem -- which was one of the hierarchal storages and kind of

22   the mess that becomes, and also trying to unify that user

23   experience a little better than it was.  I think that was the

24   basis of it.  So he himself is saying it was making the user

25   experience better.  He also said, later in his deposition, that

M2S5mirA

1    really what they were trying to do was make the metaphor

2    better.

3            Again, we make no claims that we have come up with

4    anything dealing with file systems in general, whether it is

5    files, storage, or anything like that.  Our approach was to do

6    a little better on the metaphor side for the user, I think.

7    And this is in Mr. Freeman's deposition at page 72, lines 19

8    through 24.  So, even their inventor is saying we are not

9    missing with the innards of the computer, we are not changing

10   the way the computer works, we are changing the metaphor to

11   make it a little lit better for the user because the user can't

12   remember all those names that they used to have.

13           THE COURT:  OK.

14           MS. KEEFE:  So, your Honor, I would again point back

15   to the *Berkheimer* case, which came out after *Enfish*.

16   *Berkheimer* also, in fact, distinguishes *Enfish* and reminds us

17   that the computer itself has to be improved and really walks

18   through why the overly broad claims 1 through 4 were still

19   ineligible because they didn't claim what was supposed to have

20   been the thing that actually improved the computer until the

21   dependent claim.  Here there is no dependent claim that states

22   that.

23           THE COURT:  OK.

24           MS. KEEFE:  OK?

25           So your Honor wanted the boxes, they're back.

M2S5mirA

1          THE COURT:  Before we get to the boxes I just had a

2     couple of questions on claim construction.

3          MS. KEEFE:  Yes, your Honor.

4          THE COURT:  There is a dispute between the parties on

5     the issue of data unit.  So Mirror Worlds, as I understand it,

6     wants to limit data unit to items of information that are of

7     direct user interest and I understand the argument of adding a

8     direct user interest, but Facebook wants to limit a data unit

9     to a document and I'm not quite sure why Facebook wants to do

10    that.  Mirror Worlds wants to define it as any item of

11    information which would include such items as videos,

12    photographs, and the like, and I don't understand why Facebook

13    doesn't accept that because I would have thought that when the

14    issue is whether all of the data units that are in the computer

15    system are in the mainstream, expanding data unit beyond simply

16    document to include such things as video and photographs, would

17    improve Facebook's argument, not undercut it.  So I don't

18    understand why Facebook takes an issue with simply defining

19    data unit not to include the amorphous term which I understand

20    was denied at various stages of the process by Mirror Worlds of

21    direct user interest but agree that data unit should not just

22    be document but, rather, should be items of information unless

23    Facebook says document includes videos, photographs, and the

24    like.

25         MS. KEEFE:  So if I understand your Honor's question,

M2S5mirA

1   I may be agreeing with your Honor, I'm just not sure, so let me

2   make sure I am walking it through.

3        Facebook believes that a data unit, essentially, is

4   any piece of information.  It's any piece of information which

5   could include a document, a photo, a video.  It even includes

6   software.  It doesn't have to be something that you can

7   tangibly hold on to or touch or organically create.  Instead,

8   it really is any piece of information.

9        THE COURT:  OK.

10        MS. KEEFE:  What plaintiff is trying to do is trying

11   to say, well, it's not any information, it is only the

12   information that's of direct interest to the user so they can

13   try to get rid of a lot of the pieces of information that are

14   on the back end of a system.

15        THE COURT:  Please, I understand that.

16        MS. KEEFE:  OK.

17        THE COURT:  And I believe Facebook has the much better

18   of the argument that to define data unit should not be defined

19   as to include a limitation of direct user interest.

20        MS. KEEFE:  Then we agree.

21        THE COURT:  So I thought that Facebook defines data.

22   Unit as "document" and that would suggest a textual limitation

23   rather than the way in which you have just defined document,

24   which is a unit of information.

25        MS. KEEFE:  I actually agree wholeheartedly with your

1   Honor.

2               THE COURT:  OK.

3               MS. KEEFE:  The only reason we did what we did is

4   because in the file history there is a definitional statement

5   that says a data unit is a document, but it goes on, because a

6   document can contain any type of data and they cite to the

7   specification which is exactly what your Honor was talking

8   about -- documents, videos, pictures, streams, software.

9               So we agree wholeheartedly with your Honor that it can

10  be anything.  Document is not, in this case, limited to

11  something textual.  And the citation that they reference, page

12  11, lines 20 through 22, is the portion of that '227

13  specification that says it's documents or pictures or videos,

14  or software.  So, your Honor is a hundred percent right, it is

15  anything.

16              THE COURT:  OK.

17              MS. KEEFE:  Information is information and we are

18  good.

19              In fact, I know your Honor is already there but up

20  above in the exact same page the patent owner disputed the

21  relevance thing because this says:  In other words, all the

22  data units, without regard to whether it was generated

23  internally or externally, are of significance to the user.

24  Their point is, hey, if it came into the system it is

25  significant so we are not playing the name of subjective and so

M2S5mirA

1   data units are as broad as your Honor thinks.

2                  THE COURT:  OK.

3                  MS. KEEFE:  Did Your Honor have any other questions?

4                  THE COURT:  Not on claim instruction.

5                  MS. KEEFE:  Would you like me to grab my boxes on

6   infringement.

7                  THE COURT:  Yes.

8                  MS. KEEFE:  Your Honor, may I also use the bar between

9   the jury and us?

10                 THE COURT:  Sure.

11                 MS. KEEFE:  As your Honor remembers with the boxes and

12  where things are stored and how they're stored, that's really

13  what this case comes down to.  Now happily, the case has been

14  simplified a little bit.  Right now we have the computer system

15  being defined -- I will start with Timeline.  For the Timeline

16  system the computer system is defined by plaintiffs to be the

17  Timeline aggregator so that goes into our system, and the

18  Timeline database.  What the claims say is that every single

19  data unit, every piece of information that goes into the

20  computer system -- that goes into our white box here -- must be

21  in the main stream.

22                 Mirror Worlds has defined the main stream to be only

23  the Timeline database.  Main stream equals Timeline database.

24  Therefore, everything that comes into the white box has to be

25  somewhere in the Timeline database.  If there is any

M2S5mirA

information that comes into the aggregator that does not make

its way into the time-ordered, Timeline database, there can be

no infringement.

        We all agree -- I will call these user actions.  We

all agree that the user actions all go into the Timeline

database.  Any time somebody likes a post, any time someone

posts a photo, any time someone says hi to somebody on their

Timeline, these go into the Timeline database.  Absolutely.  No

disagreement there.  And they're going to cite page after page

of documents that say all user actions get stored in the

Timeline database.  We don't disagree with that.  The part we

disagree with is there are other things that make their way

into the aggregator that don't go into the Timeline database.

        The first question your Honor may be asking yourself

is, well, then why wasn't the computer system just the Timeline

database?  Why are we fussing with the aggregator?  Why does it

have to be part of the system?  The aggregator has to be part

of the system because the claims require that the computer

system be able to parse out a substream, you have to be able to

take a substream out of the main stream.  The aggregator is the

only brain that can do that.  The aggregator is the guy that

has the brains to say, hey, only deliver me action unit 1 and

action unit 2.  There's my substream.  There were once four,

now there is two.

        THE COURT:  Hold on.

M2S5mirA

1          I have always understood the plaintiff to argue that

2     the computer system with respect to Timeline and activity log

3     is the, quote, Timeline fact end that includes the Timeline

4     aggregator.

5          MS. KEEFE:  That's correct.

6          THE COURT:  It would be late in the day if the

7     plaintiff said that the Timeline aggregator was not part of the

8     computer system for Timeline and activity log.

9          MS. KEEFE:  One hundred percent true, your Honor.

10    You've got it.

11         THE COURT:  I am right, am I not, plaintiff?

12         MR. FENSTER:  You are.

13         THE COURT:  There we go.

14         MS. KEEFE:  One hundred percent.  I am just explaining

15    where it is in there, because it is necessary.  The problem is

16    the aggregator is the brain and the aggregator receives

17    information from multiple sources.  It doesn't just talk to the

18    Timeline database.  They're not in an exclusive relationship,

19    if you will.  Instead, we know from unrebutted testimony that

20    at least one of the things that goes into the aggregator but

21    never touches the Timeline database, are major life events.  A

22    major life event on Facebook is a separate flow, it is a

23    separate program.  That lets any user go in and make a major

24    life event.  *Hey, I got married today.  I started a new job at*

25    *the Southern District of New York.  I had a baby.*  These are

M2S5mirA

called major life events.  When a user's Timeline is displayed

to it the query comes into the aggregator, the aggregator says,

hey, go get me from the Timeline database all those action

units that I might want, but also go get me major life events.

Those come from tao and they go into the aggregator so they can

be combined, as the name suggests, it is an aggregator, it is

bringing things together -- so it can eventually be pushed out

to the front end.  It is not disputed that the major life

events information goes into the aggregator.

        The dispute that plaintiff first raises is it's not a

data unit because it is not of interest to a user.  First, your

Honor already understands the claim construction point but,

even if it were true, I find it highly implausible that my

major life event of getting married or having a baby is not of

direct interest to me so that absolutely is interesting to me

and that goes into the aggregator.  The next and only argument

that I see now is that somehow they are now arguing that this

piece of information, this major life event that comes from tao

so that it can be pulled together, aggregated with information

from the Timeline database, is not received.  That's the new

argument we see.  That argument is nowhere in their expert

reports.

        Their expert talks about how there are special calls

in order to write a piece of information into the Timeline

database.  They call these function calls and it basically is

M2S5mirA

1    something like a little line of code that says here is how you

2    write this into the database.  Their expert says that's how I

3    know that information got into the Timeline database.  Nowhere

4    in the expert's report does he say that these pieces like

5    Timeline database are not received by the aggregator.  We now

6    have an attorney argument that there are no function calls to

7    write this information into the aggregator.  There don't have

8    to be.  Those are merely function calls to write information to

9    the timeline database.  So of course you are not going to find

10   a function call for the major life event to be written into the

11   Timeline database.  That's not where it is stored.  We have

12   unrebutted testimony from the engineers saying, unequivocally,

13   major life events, information about family members, your

14   education history, and places that you have lived, all go into

15   the aggregator but are never stored in the Timeline database

16   because that's reserved for user actions.  As a result, we now

17   have all of this information in the computer system that has

18   never been in the main stream.  They simply cannot show that

19   the main stream is inclusive of all data units received by or

20   generated by the computer system because all of this data has

21   come into the system and never touched the Timeline database.

22   The exact same thing is true for Newsfeed.

23          THE COURT:  By the way, the way in which the motion

24   was argued is the major life events are part of the UDB -- user

25   database?

M2S5mirA

1          MS. KEEFE:  That's correct, your Honor.

2          THE COURT:  Because you treat, at least in dealing

3     with timeline and the activity log you treat TAO and UDB as one

4     set of information.

5          MS. KEEFE:  They're essentially another computer

6     system that can be thought of together that are sending their

7     information into the aggregator; that's correct, your Honor.

8          THE COURT:  OK.

9          MS. KEEFE:  For Newsfeed and the multi-feed we have

10    basically the exact same thing.

11         THE COURT:  There are a series of other specific items

12    that the motion argues were also included in the computer

13    system but not in TimelineDB.

14         MS. KEEFE:  Yes.

15         THE COURT:  And one of the faults that the federal

16    circuit found was that Facebook was bringing up new items that

17    weren't included in the motion for summary judgment so I would

18    have thought that there were some other clear items that

19    allegedly go into the Timeline aggregator and don't go into the

20    TimelineDB.

21         MS. KEEFE:  Yes, your Honor.  For example, the perams,

22    the parameters that were used.  That was another one of the

23    things that we argued before.

24         What we did here, your Honor, was to try to make it as

25    clean and clear as possible, we went with the unrebutted pieces

M2S5mirA

1   of evidence that the engineers talked about during their

2   depositions so that there couldn't be another argument that,

3   oh, well, we didn't know about that one or we hadn't heard

4   about this, or that, or something along those lines.  And so,

5   for example, we cite to deposition testimony where our

6   engineers specifically say, unequivocally, life events, major

7   life events is something that isn't in the Timeline database

8   prior to 2018.  That was during the early part of discovery.

9   Now, they didn't ask any other questions during depositions.

10  They've always had the code, they've always had our documents.

11  During depos, major life events for Timeline came up and major

12  life events was directly discussed during deposition and that

13  is cited in our papers and I can get you the cites.  Some of

14  the other investments didn't come up so when we filed our

15  motion for summary judgment, we also attached a declaration

16  that allowed our person to include the other materials that no

17  one ever asked about.

18          THE COURT:  No, no.  Well, but I'm really not

19  directing myself to the first motion for summary judgment, I am

20  just trying to make sure that I understand this motion for

21  summary judgment and you plainly make an argument about TAO and

22  UDB and I thought there was second argument about major life

23  events but major life events should simply be part of UDB.

24          MS. KEEFE:  That's correct, your Honor, they come from

25  UDB.  That's where they are stored before they come to the

M2S5mirA

1    aggregator.

2            The real point here isn't where they came from, it is

3    that they end up in the aggregator and they do not end up in

4    the Timeline database.  That's the real point.  The fact that

5    the aggregator talked to all of these other people, if every

6    one of the things that dropped into the aggregator then dropped

7    into TimelineDB, we wouldn't be here.

8            THE COURT:  Co-efficient is a --

9            MS. KEEFE:  Co-efficient is absolutely something that

10   comes into the aggregator that is not stored in either of the

11   main streams.  Co-efficient is a piece of information used in

12   both aggregators -- Newsfeed and Timeline -- in order to figure

13   out what is most important to you.

14           THE COURT:  But the only reason I raise that is that

15   it would seem to me that if there is any information that is in

16   the aggregator that's not in the main stream there is

17   non-infringement, so even co-efficient would be sufficient unto

18   itself even without getting into TAO.

19           MS. KEEFE:  Your Honor is a thousand percent correct.

20   And I will admit that one of the reasons that we focused on

21   things like groups and the major life events was because we

22   didn't know how your Honor was going to construe "data unit"

23   and so we were trying to find things that, at a minimum, were

24   still of user interest so that even under plaintiff's proposed

25   definition we would still win.  That's why we show you all of

M2S5mirA

the things including co-efficient, including ranking scores
that all come in.  But because they challenge that those were
somehow not data units, we were trying to go to the other end
of the extreme to find something that would even fit their
definition of data unit.

THE COURT:  OK.

MS. KEEFE:  I think your Honor understands everything
is exactly the same for Newsfeed, it is just different words,
it is just different things go in there.  For example, in the
multi-feed leaves, that is supposed to be the main stream.  All
of the documents absolutely show that all user actions end up
in the leaves.  We do not dispute that.  All user actions go
in, that's the little clear color boxes, they're all there, no
problem.  The problem again, just like before, is that the
Newsfeed aggregator also has a list of your friends that are
not stored in the multi-feed leaves.  It has pages that have
you liked and a page that you liked means you said I like that
page.  Facebook uses that information to grab information from
that page in order to give it to you.  That's not stored in the
leaves.

Groups that you have joined, co-efficient scores.  We
have all of that information sitting in the aggregator that
never makes its way into the multi-feed leaves, therefore there
is a computer system in which the main stream does not include
each and every data unit that is generated by or received by

M2S5mirA

1      the computer system.  It's that straightforward, your Honor.

2                  THE COURT:  Again, you haven't emphasized the

3      additional items that came up which you asked the Court of

4      Appeals to consider like ad finder and EGO, but those are now

5      developed into the record.

6                  MS. KEEFE:  Absolutely, your Honor, and they still

7      work incredibly well.  The only argument that plaintiff makes

8      against ad finder and ads, they're also now trying to say -- I

9      think -- that it is not a data unit if it is not of interest to

10     the user and if it is not organically created.  And they try to

11     make a difference between organic creation -- something that a

12     user creates -- versus an ad which is created by someone else.

13     Now, Facebook admits fully that it calls those two things

14     different.  It calls things that a user or my friends create

15     organic content and it calls ads inorganic content because that

16     comes from someone else, it comes from another source.  It

17     doesn't matter whether it is organic or inorganic.  That's not

18     in the patent, that's not in the claims.  Ads, undoubtedly,

19     come from ad finder into the aggregator so that they can be, as

20     the term suggests, aggregated with the information from the

21     leaves before it is passed to the front end.  So absolutely,

22     your Honor, those are still involved.  We were simply being

23     extremely conservative about finding things that they couldn't

24     argue with even under their definitions.  But, those are

25     absolutely still there, your Honor.

M2S5mirA

1          THE COURT:  All right.

2          MS. KEEFE:  The motion also has two other small

3    pieces, the first being the glance view.  Did you want me to

4    address that?

5          THE COURT:  I don't think it's necessary.

6          MS. KEEFE:  OK.

7          Our papers very clearly spell that out so I will

8    simply rest on the papers for glance view for direction and

9    control.

10          THE COURT:  Sorry.  For?

11          MS. KEEFE:  The issue of direction and control.  They

12    also had to show that Facebook directed and controlled the

13    users because it is a joint environment.  Facebook does not

14    provide computers or displays and Mirror Worlds didn't dot the

15    I or cross the T of actually pointing to the proof that

16    Facebook controls the user somehow.  And that's also in our

17    papers.

18          THE COURT:  OK.

19          MS. KEEFE:  Thank you, your Honor, very much.

20          THE COURT:  Thank you.

21          MR. FENSTER:  Your Honor, Mr. Wang is going to address

22    the 101 issue and I will be addressing non-infringement.

23          THE COURT:  OK.

24          MR. FENSTER:  Would you like to hear 101 first?

25          THE COURT:  Yes.

M2S5mirA

1          MR. WANG:  Thank you, your Honor.  Your Honor, may I

2    share a copy of some slides that I prepared?  We are not going

3    to go through them all but I brought you hard copies.

4          THE COURT:  Sure.

5          MR. WANG:  Your Honor, before I dive into the 101

6    issue I just wanted to clarify the record.  Facebook's summary

7    judgment motion challenged 101 non-infringement based on the

8    main stream, glance view, and willfulness.  There was no

9    challenge to this direction or control issue in their motion

10   for summary judgment that we are discussing now.

11         THE COURT:  Hold on.  Ms. Keefe wants to say

12   something.

13         MS. KEEFE:  He is right.  That's in our motion to

14   strike the experts because he had no evidence of it.  So I

15   apologize, I got it confused.

16         It ends up the same way, your Honor, but it was not in

17   the non-infringement motion, he is correct.  It is in our

18   motion to strikes portions of Koskinen reversal and it results

19   in the same thing which is no infringement, but I do apologize

20   for mixing them up.

21         THE COURT:  Well, let me ask, direction and

22   controlled, where does that fit into Facebook's motion?

23         MS. KEEFE:  Your Honor, it is in our motion to strike

24   portions of Dr. Koskinen's -- who is their technical expert --

25   report.  It is a factor in trying to prove infringement overall

M2S5mirA

1    because if the system is a joint system where two separate

2    users are required in order to find a single case of

3    infringement, then the expert has to show the concert of

4    activity and that there has been a direction and control.

5    Since this is an indirect case they have to prove that.  He did

6    not, and so that would be something he couldn't talk about

7    which means they wouldn't be able to find infringement.  But,

8    it is not in our summary judgment motion.

9           THE COURT:  But it doesn't directly affect your

10   arguments of non-infringement --

11          MS. KEEFE:  It does not.

12          THE COURT:  -- that you just made.

13          MS. KEEFE:  It does not.  It is an additional element

14   for later, it does not affect the arguments I just made.

15          THE COURT:  OK.

16          MS. KEEFE:  Thank you.

17          THE COURT:  Go ahead, Mr. Wang.

18          MR. WANG:  Thank you, your Honor.

19          So, addressing the 101 issue, just to sort of address

20   some of the questions you raised first, your Honor, before

21   getting to the evidence I am prepared to show you, I think it

22   is a very reasonable question about why not the last motion, or

23   why not even an earlier motion such as the motion to dismiss at

24   the 12(b)(6) or 12(c) stage.  At this point this late in the

25   case, it really is sort of a hail Mary brought by Facebook, and

M2S5mirA

1    as a consequence of bringing this motion so late, the factual

2    record has developed such that summary judgment on 101 is not

3    proper.

4           Now, step one, as counsel stated, is a question of

5    law.  And I know your Honor is familiar with the overall 101

6    question being a question of law.  Nevertheless, there are many

7    cases that acknowledge that, at a minimum, step two may have

8    underlying factual questions that could preclude a finding of

9    101 ineligibility.  And I will take you through the record that

10   is developed in this case that really does preclude summary

11   judgment even if you were to get to step two, which I don't

12   think is necessary in this case, your Honor, because at step

13   one the patents in suit and the claims that are asserted are

14   not directed to an abstract idea regardless of the different

15   formulations that we have heard from Facebook to date.  The

16   claims really are directed to an improvement on how the

17   computer operates.  The example that Ms. Keefe showed us simply

18   is not the invention and it runs afoul of precedent saying you

19   cannot oversimplify the claims.  You have to look at the

20   claims, you have to look at the claims as a whole, and you have

21   to look at the specification to determine really what these

22   claims are directed to, and when you do that properly you see

23   that what it is directed to is an improvement on a computer

24   operating system.  And the claims and the patents themselves

25   explain the conventional systems and how the claims improved

M2S5mirA

1    upon that.  The PTO has recognized it, another District Court

2    has recognized it, we have statements from the Federal Circuit

3    twice that confirm that they're not directed to the supposed

4    abstract idea that Facebook has presented, and we have numerous

5    analogous Federal Circuit precedents that fit exactly the

6    claims in this case.

7         So, your Honor, if I can take you to my slide 3, this

8    is a summary of what I just mentioned to the Court.  These

9    claims describe a specific computer operating system that was

10   an improvement to conventional systems, not an abstract idea.

11   And what you can see is Facebook's argument is inconsistent

12   with the law, the specific requirements of the claims, the

13   specification, their own prior statements, the PTO, the federal

14   Second Circuit's statements twice, the underlying concern that

15   drives 101, and analogous federal circuit president dent.

16        Slide 4, your Honor, just gives you that at step one

17   we have to be careful not to oversimplify the claims because

18   almost any claim, if you boil it down enough, could be deemed

19   an abstract idea and the Supreme Court has warned us not to go

20   that far, you have to look at specific requirements of the

21   claim.  But, that's not what Facebook does.

22        Now, on slide 5 I just have a visual, and I know that

23   you have to look at specific words of the claims, but these are

24   the claims that are asserted in this case:  What Facebook wants

25   to do is oversimplify all of these claims to organizing

M2S5mirA

information in a time-ordered manner.  Now Ms. Keefe changed
that formulation this morning, she said organizing and storing
information but, regardless, they're oversimplifying the
claims.

Now, if you look at slide 6, your Honor, this is claim
13 under the '227.  She is overlooking the bullet points that I
listed on the right.  There was a disregard for the fact that
this is directed to improvement on a computer system, there was
no mention of generating a main stream, and importantly, that
that main stream has every data unit that is received or
generated; no mention of the substream, no mention of any of
the bullet points that I list on the right, your Honor.

When you look at the next slide, your Honor, this is
claim 1 from the '538 patent which is also asserted.  You heard
Ms. Keefe mention that there is nothing in the claims that
tells you how to store these documents or these data units
depending on the patent.  That's incorrect.  If you just look
at even the second clause of this, it is:  Causing the computer
system to automatically, without user interaction and without
requiring a user to designate directory structures or other
pre-imposed document categorizations structures.  So, it says:
This new, improved computer operating system, users don't have
to do that.  What it does, instead, is it stores the
documents -- or data units, depending on the patent -- as a
time-ordered main stream.  And so in this sense, just using

M2S5mirA

1     this limitation as an example, your Honor, this is not one of

2     those result-oriented inventions.  This tells you what they

3     were avoiding -- the result -- but it also tells you how they

4     solved that result -- the solution.  And the solution was to

5     have a time-ordered main stream just in this limitation alone,

6     your Honor.

7          The next slide I have claim 1 from the '439 in even

8     more detail and even more specific about the technological

9     invasion that is at the core of all of these asserted claims,

10    your Honor.  It is not simply organizing info in a time-ordered

11    manner as Facebook asserts.

12         Beyond that, your Honor, it is not just the words in

13    the claims, your Honor, as you know.

14         THE COURT:  I'm sorry.  What was the technological

15    improvement?

16         MR. WANG:  The technological improvement, your Honor

17    was a better computer operating system.  And why was it better,

18    your Honor?  Because the conventional systems --

19         THE COURT:  But the patent doesn't spell out how,

20    technically, that would be done.

21         MR. WANG:  Your Honor, I disagree with that.  How it

22    does spell out how it is done, your Honor, is it says instead

23    of having a file or hierarchy structure which was prevalent in

24    conventional systems, your Honor, we will instead use a main

25    stream, and it explains when a main stream is and what a

M2S5mirA

substream is.

THE COURT:  I am no engineer but the technological concept does not appear to be very sophisticated and you can dress it up.  I have to apply what the federal circuit has said step one in *Alice* is all about, and so I can accept that if it is directed at improving computer functionality, rather than simply an idea that uses a computer, it is patent-eligible.  Now, that doesn't require a great deal of technological expertise, but trying to dress the patent up as a technological innovation appears to me to go beyond the patent, the claims in the patent.  But, you can go on.

MR. WANG:  Your Honor, I think we are talking about step 1 in the analysis, your Honor.  You may read the claims and you may say the claims don't seem to be sophisticated maybe, for lack of a better word, or have much technological detail, but this is one of the concerns that I think the Federal Circuit and the Supreme Court have tried to pass down to practitioners and district courts, your Honor.  You have to look at the claim as a whole, you have to look at the specification, potentially claim construction, potentially prosecution history to see what these claims are really directed at.  Even if, reading the claims themselves facially seems not so sophisticated, when you take a look at claim constructions, when you take a look at about what the patents say and the specifications themselves, then --

M2S5mirA

```
 1          THE COURT:  I understand that.  I can accept all of
 2     that.  My quarrel was simply to go beyond what the patent
 3     actually claims.  What the patent claims and is directed toward
 4     may well satisfy the current definition of how to define step
 5     one under Alice under federal circuit precedent.  To try to
 6     convince me that the claim is doing something more than the
 7     claim does appears, to me, to go too far.  That's OK.
 8          MR. WANG:  Your Honor, I'm not trying to do that, your
 9     Honor.  That's not the purpose of the argument on step one for
10     me, your Honor.  I do think that the language of the claims
11     themselves make it clear that this is an improvement to a
12     computer operating system and it says it does so by the main
13     stream and by explaining what the main stream consists of.
14     And, importantly, that those data units in the main stream are
15     kept in a time-ordered manner.  Now, why that is a
16     technological improvement you have to look at the specification
17     to do that, your Honor, because when you look at the
18     specification it explains what the conventional systems were
19     and the drawbacks of those systems.  And by comparing it to
20     those older systems you can see that this new way to structure
21     a computer operating system was an improvement to the
22     computer's functionality.  And that's my point on step one,
23     your Honor.
24          I do want to quickly say that, you know, Facebook in a
25     way has been inconsistent with how it is describing the
```

M2S5mirA

```
1    supposed abstract idea here and if you actually go back, your

2    Honor, and look at their prior statements in this case, you

3    will see that it is much more technologically oriented than

4    they are trying to convey now.  When you look at my slide 13,

5    your Honor, that's an excerpt that is taken from their claim

6    construction brief, whereas today they have one formulation

7    they previously said the claims are directed to an operating

8    system stored in a chronologically-ordered stream, that no name

9    is required.  That is directly contrary to what you just heard

10   this morning, your Honor.  And it refers to these coined terms.

11   Now that's important, your Honor, because now we are not

12   talking about these generic items, we are talking about terms

13   that the patentees expressly described.  These are specific

14   data structures, data units, main streams, substreams, that

15   present a technological improvement to a computer operating

16   system, your Honor.

17            I want to take you to slide 16, your Honor.  This is

18   where the patent office recognizes that this is not an abstract

19   idea to step one.  Instead, they said the '227 was directed to

20   the way in which computers name, organize, and retrieve

21   electronic documents.  A particular use of streams and

22   substream, and therefore it is not a '227 -- it is not an

23   abstract idea, your Honor.

24            At slide 17 and 18, your Honor, I am just giving you

25   the excerpts from the two past federal circuit decisions that
```

M2S5mirA

1    look at the '227 patent, among others, and how the federal

2    circuit describe what claims cover -- very different than the

3    proposed abstract idea that Facebook is presenting today.

4           I will skip the preemption slides that I have for you,

5    your Honor, but I will leave it as in the briefs their; own

6    expert admitted that there is no preemption risk here and that

7    is the concern that undergirds this 101 analysis.

8           I want to end on step one, your Honor, with slide 21,

9    which goes to the *Enfish* case that we have been talking about

10   today.  What was eligible there at step one was this specific

11   type of data structure.  That is analogous to what we have

12   here, your Honor, and when you look at actually the '227's own

13   specification, it expressly says the stream is a data structure

14   and it goes on to explain what that stream is.  And in *Enfish*,

15   you have the specific type of data structure that did improve

16   the way the computer stored and retrieved data.  That is very

17   hard to distinguish from the inventions in this case, your

18   Honor.

19          The next few slides are other very helpful federal

20   circuit cases, your Honor, on step one, then I will take you to

21   slide 25 which goes into step two.

22          Now, of course, if you disagree that the claim is

23   directed to an abstract idea you don't have to go here, but to

24   the extent that you do find that they are directed to abstract

25   idea, that we survive summary judgment at step two, at a

M2S5mirA

1    minimum.

2            Now, at step two the Courts look at is that an

3    inventive concept.  Do they simply describe well understood

4    routine or conventional activities -- and that's not the case

5    here, your Honor.  Just like past cases at the federal circuit,

6    the specifications own description of the invention explains

7    that it is not conventional.  The specification, as I

8    mentioned, distinguished past systems.  The PTO recognizes

9    that, District Judge Schroeder recognized that, and what I

10   really only want to focus on now, because I know you understand

11   the issues and have read the briefs, your Honor, are the 35

12   pages of factual analysis, not conclusory statements that we

13   put in the record from our expert Dr. Koskinen.

14           Let me skip to slide 32, your Honor.  So one of the

15   problems for Facebook at step two, your Honor, is by bringing

16   this motion so late, the factual record has been developed.

17   Importantly, the factual record includes an analysis from

18   Dr. Koskinen that goes directly to the step two analysis.  And

19   this is the underlying factual question for step two that

20   precludes summary judgment.  In his report -- and I know you

21   have awe full copy it, your Honor --

22           THE COURT:  You know, by going through this, of

23   course, you are supporting Facebook's position as to why it

24   didn't move on 101 earlier in the case and, particularly, as

25   part of the first motion for summary judgment.  You are

M2S5mirA

```
1    explaining to me if I get to step two why this is a heavily
2    fact-laden determination based upon all of the discovery in the
3    case.  That seems to underline Ms. Keefe's argument as to why
4    she didn't make the 101 motion in the earlier motion for
5    summary judgment.
6             MR. WANG:  Your Honor, I don't think it does, your
7    Honor, and I will explain why.
8             If Facebook really believed that there were no
9    underlying questions of fact for these claims, it could have
10   moved at 12(b)(6), it could have moved at 12(c).
11            THE COURT:  You resisted summary judgment from the
12   outset of the case at every turn.  To fault Facebook now for
13   not having made a 101 motion, which you say is heavily
14   fact-laden at step two, seems to be somewhat of an
15   extraordinary about face.  Your argument now is Facebook,
16   despite the factual questions on step two of the *Alice*
17   analysis, should have moved for summary judgment long ago.
18            MR. WANG:  Your Honor, Facebook believes that there
19   are no underlying questions of fact.  If they really believed
20   that they could have moved at any time, your Honor.
21            THE COURT:  You disagreed with that.
22            MR. WANG:  Your Honor, we disagreed for different
23   reasons.  We disagreed because our understanding of the
24   practice in the Southern District is that there was a single
25   summary judgment opportunity at the end of the case and the
```

M2S5mirA

1   issue that Facebook raised was challenging the main stream

2   limitation and at that time, which we --

3           THE COURT:  But if that understanding is correct,

4   Facebook would have had to have put all of its apples, so to

5   speak, in the basket of making its first motion for summary

6   judgment to include a 101 claim and you are saying that's what

7   they should have done.

8           MR. WANG:  Your Honor, I think if they really believed

9   it if they should have done that, your Honor.  And I know we

10  were incorrect on the practice of when you can bring summary

11  judgment and the timing of that, but that be as it may, your

12  Honor, the record is that Dr. Koskinen addressed step two and

13  at this -- given the standard review now, it's any evidence

14  from any source that can reasonably be read in favor of the

15  non-movement would preclude summary judgment.

16          THE COURT:  Of course I don't have to get to step two

17  if I agree with you at step one.

18          MR. WANG:  That's right, your Honor.  That's right.

19  And I don't believe you do have to get to step two, your Honor.

20  So, I think I will leave that as far as the 101 issues, your

21  Honor.

22          The other item I was supposed to address was the

23  willfulness one which Ms. Keefe is submitting on the papers and

24  we are fine with that, your Honor, unless you have any specific

25  questions, of course.

M2S5mirA

1          THE COURT:  No.  Thank you.

2          MR. WANG:  Thank you.

3          MR. FENSTER:  Your Honor, my I remove my mask at the

4     podium while I speak?

5          THE COURT:  No.  If I understand it, those are the

6     rules in our court which is why I am wearing a mask and would

7     rather not be wearing a mask up here.

8          MR. FENSTER:  No problem.

9          Your Honor, summary judgment on a non-infringement --

10         THE COURT:  But you should use the mic.

11         MR. FENSTER:  I am.

12         Your Honor, summary judgment of non-infringement is

13    not warranted and must be denied because there are fact issues.

14    Facebook is asking you to weigh the evidence.  You are

15    prohibited from doing so on summary judgment.  I know you know

16    this.  But they're asking to you weigh the evidence.  Your

17    Honor, we have submitted evidence as to a main stream.

18    Dr. Koskinen is an expert, he has submitted testimony based on

19    his review of all the documents, all the depositions, and

20    source code.

21         THE COURT:  No, no.  But I have to examine what the

22    cited sources of his opinions are.

23         MR. FENSTER:  Yes.  Your Honor, in our opposition to

24    the motion for summary judgment --

25         THE COURT:  Hold on.  Let's just stop for one moment.

M2S5mirA

```
 1              Facebook submits sworn statements by people familiar
 2     with the system who say, unequivocally, that there is
 3     material -- data units -- in the computer system which are not
 4     in the main stream.  We then have Dr. Koskinen on some issues
 5     pointing to documents that he says supports the proposition
 6     that the items in the computer system do come into the main
 7     stream.  So, then I have to look at what the specific items are
 8     that he says supports that proposition to counter Facebook's
 9     people with personal knowledge of the system.  The Court of
10     Appeals faulted Facebook the first time around for not having
11     submitted unequivocal statements that there were data units in
12     the computer system that are not in the main stream.  New
13     motion for summary judgment, now unequivocal statements, and it
14     appears that Mirror Worlds countered that with Dr. Koskinen and
15     exhibits.  So then I have to look at the exhibits and make a
16     determination whether they in fact support Dr. Koskinen.
17              Go ahead.
18              MR. FENSTER:  Your Honor, you said at the beginning
19     when they brought their motion that this was a credibility
20     determination, it was a credibility test.  And Ms. Keefe and
21     Facebook stood up here and told you, unequivocally, that
22     information from TAO goes to the aggregator.  You accepted
23     that, you put that in your order, and the federal circuit
24     reversed you on exactly that point because the evidence did not
25     support that, that put you down the primrose path.
```

M2S5mirA

1          THE COURT:  Hold on.

2          That related to TAO as it related to the Newsfeed and

3    the multi-feed system.  It didn't specifically relate to

4    Timeline with he respect to Newsfeed and multi-feed system.

5    Yes, Facebook still relies on TAO but also relies on the other

6    individual inputs that it raised with the federal circuit and

7    the federal circuit said, hey, you didn't raise them before so

8    we are not going to consider them in the first instance now on

9    appeal.

10          MR. FENSTER:  Yes.

11          Your Honor, my point is that you have to --

12          THE COURT:  I have to look carefully at what the

13    evidence is on the motion for summary judgment.  Undisputed.

14          MR. FENSTER:  OK.  Now listen to what --

15          THE COURT:  Could I ask you to --

16          MR. FENSTER:  Let me cut to the smoke and mirrors,

17    please.

18          THE COURT:  Could I ask you first --

19          MR. FENSTER:  Sure.

20          THE COURT:   -- I raised with Facebook the issue of

21    claim construction --

22          MR. FENSTER:  Yes.

23          THE COURT:   -- with respect to data unit and Facebook

24    agrees that data unit can refer to documents broadly construed

25    to include information including videos and photographs and the

M2S5mirA

1      like.  So the only dispute between the parties is

2      Mirror Worlds' addition of direct user interest as a

3      qualification for data unit.  Among other things, it appears

4      that that's an interpretation that Mirror Worlds specifically

5      disclaimed when it went through the covered business method

6      proceeding.

7              MR. FENSTER:  OK.  Let me clear that up because that

8      is absolutely not true.  OK?  And the reason, your Honor, is

9      because in the covered business method review, the standard of

10     claim construction is different.  It is broadest reasonable

11     interpretation, it is decidedly different and broader than the

12     claim construction that you have to apply that all district

13     courts and the federal circuit apply in a District Court

14     proceeding.  OK?  So all of the statements that you are

15     referring to and that Ms. Keefe referred to about disclaimer

16     that a data unit is a document, were under a different standard

17     the broadest reasonable interpretation standard.

18              THE COURT:  But -- OK.

19              MR. FENSTER:  OK?  So now, under a proper district

20     court instruction --

21              THE COURT:  Hold on.  Don't I have to look at what

22     Mirror Worlds said its interpretation of the claims mean?  Does

23     it mean one thing in one proceeding and another thing in

24     another proceeding?

25              MR. FENSTER:  Yes.  The answer is yes when there are

M2S5mirA

1    different standards, your Honor.

2         Look.  It would be remiss of Mirror Worlds to say that

3    to not account for the difference in the claim construction

4    standard and the CBM proceeding required us to apply the

5    broadest reasonable interpretation because that's the same

6    standard that's applied in prosecution.  OK?  Under the

7    broadest reasonable interpretation we went broad to document.

8    OK?  But the District Court -- you -- have to interpret the

9    data unit here under normal federal circuit guidelines --

10        THE COURT:  Hold on.

11        MR. FENSTER:  -- in light of the intrinsic record.

12        THE COURT:  Hold on.

13        The position that you took in the covered business

14   proceeding was not the broadest possible view when you said

15   that data unit should not be limited to items of direct user

16   interest.  It was a narrowing.  And similarly, now --

17        MR. FENSTER:  It wasn't narrowing, your Honor.  To say

18   that it was not a direct user interest, it is not limited to

19   things of direct user interest but rather as of any document

20   which is broad, as you and Ms. Keefe discussed; was broader.

21        THE COURT:  Facebook relies on *Aylus*.

22        MR. FENSTER:  On?  I'm sorry.  I didn't hear you.

23        THE COURT:  A-Y-L-U-S, for the proposition that you

24   can't essentially disclaim a prior position that you took in

25   one of a patent prosecutions proceeding, in that case it was an

M2S5mirA

1   *inter partes* proceeding.

2          MR. FENSTER:  Your Honor, that case did not account

3   for different standards of interpretation and here we did not

4   make an inconsistent position.  Our position in the CBM is

5   consistent with our position here.  It is consistent to say

6   that under the broadest reasonable interpretation standard a

7   data unit should be broader and consistent to say in the

8   district court that a data unit, under the proper district

9   court construction, must be interpreted in light of the

10  intrinsic record as prior courts in the federal circuit have

11  approved -- have found -- that it is limited to a direct user

12  interest because that's what the prosecution history in this

13  case shows.

14         THE COURT:  Can I?

15         MR. FENSTER:  Sure.

16         THE COURT:  You went over *Aylus* pretty quickly.  It

17  was an *in partes* proceeding.  It says that the patent holder

18  was found by the position that it had taken in the *inter partes*

19  proceeding.

20         MR. FENSTER:  I confess, your Honor, I don't know

21  the -- so, the case law has changed in *inter partes* reviews so

22  *inter partes* reviews used to be under broadest reasonable

23  interpretation and later were under District Court.  I don't

24  know which this one is.

25         THE COURT:  *Aylus* was 2017.

1          MR. FENSTER:  So I think that that is a district court

2     proceeding and not under the district court interpretation but

3     I can't make that representation.  I don't know it.

4          THE COURT:  OK.

5          MR. FENSTER:  But I am absolutely certain, your Honor,

6     that the statements made in the CBM petition here were

7     addressing the broadest reasonable interpretation standard and,

8     your Honor, that is different than the standard that you must

9     apply.  OK.

10         So, if we can get past that and get to the standard

11    that you must apply, you have to interpret the data unit as one

12    of skill in the art would in light of the intrinsic record.

13    Two district courts have previously held, first, that it was of

14    significance to the user that went up to the federal circuit

15    without being disturbed on that issue and came back down, and

16    the second District Court went further and said it must be of

17    direct user interest.  The reason is because the prosecution

18    history in this case is clear.  There was clear and

19    unmistakable disclaimer by the patentee limiting the claims to

20    direct user interest.  And, your Honor, these are cited in our

21    claim construction papers and it is at pages 6 to 9 of our

22    opening brief in Exhibit 7 to that brief at page 12, this is

23    our statement:  In other words, all data units without regard

24    to whether it was generated internally or externally are of

25    significance to the user and the stream of data units of

1   significance to the user -- this was part of the file

2   history --

3            THE COURT:  But --

4            MR. FENSTER:  And then --

5            THE COURT:  Hold on.  Hold on.  But that's exactly

6   what Facebook was relying on so Facebook says, look, they said

7   all the data units are of significance to the user.

8            MR. FENSTER:  No.  That's not what they were relying

9   on.  This is from the original file history of the patent, they

10  were relying on the CBM.

11           THE COURT:  OK, but -- No, no.  That statement is not

12  a statement of limitation.  It says all data units are of

13  interest, of direct interest to the user.

14           MR. FENSTER:  Your Honor, it was absolutely clear --

15  so this is the interview summary that led to the allowance of

16  the application.  It was agreed that applicants would refine

17  the language addressing that stream of documents in the

18  broadest sense that are of significance to the user and which

19  determine the events of direct user interest in the timeline

20  without regard to whether their generation is external or

21  internal.

22           The prosecution history is clear that we were talking

23  about a personal stream, it's personal data.  And the way we

24  know that, your Honor, is -- so, from the file history, that

25  makes clear that that's what the applicant and the examiner

M2S5mirA

1    understood was the scope.  And then the definition of stream,

2    which is agreed, is that it has to be a diary of a person's

3    electronic life.  This is not any data unrelated to the person,

4    this is a stream of their interaction with the computer that

5    results in a diary of that person's electronic life.  It is

6    data that is of personal interest to the user.  If it's not of

7    interest to the user at all, it doesn't belong in their main

8    stream.  This definition is undisputed.  So, your Honor, I'm

9    asking you to put this in the context of what's claimed here

10   and you have to draw inferences in favor of the non-movant.

11        Now, what is invented here is a new operating system

12   for organizing your personal information in a time-ordered way

13   that doesn't require to you name the files but keeps them

14   stored in a main stream for you that functions as a diary of

15   your life.  My main stream is going to be different than yours

16   and it is going to be different than the table's.  There may be

17   information about the table that's in the system that doesn't

18   belong in my diary; it doesn't belong, it is not required to be

19   in my main stream.

20        THE COURT:  I thought that's the definition of a

21   substream.

22        MR. FENSTER:  I'm sorry?

23        THE COURT:  I say I thought that was the definition of

24   a substream.  I thought that the main stream includes every

25   data unit in the computer system and that the main stream can

M2S5mirA

1    then have substreams.

2            MR. FENSTER:  The substreams are cut against the main

3    stream, they are queries, they result from queries against the

4    main stream.  The main stream is --

5            THE COURT:  All data units in the computer system in a

6    time-ordered way.

7            MR. FENSTER:  They are data units that are of interest

8    to the user.

9            THE COURT:  If I disagree with you on that and I

10   thought that data unit properly construed is all documents in

11   the broadest sense of the use of documents in the computer

12   system, is Facebook then correct that the two main streams that

13   are at issue here don't include all of the data units --

14           MR. FENSTER:  No.  The answer is no.

15           THE COURT:  -- in the computer system?

16           MR. FENSTER:  The answer is unequivocally no.

17           THE COURT:  OK.

18           MR. FENSTER:  They are not correct.

19           THE COURT:  Go ahead.

20           MR. FENSTER:  And the reason I brought up credibility,

21   your Honor, is because Facebook is asking you to look at

22   things -- they're showing you something in a very specific way

23   so let me just lay this out for you.

24           We have presented affirmative evidence; Koskinen,

25   their documents, their source code, saying that every data unit

M2S5mirA

1    generated or received is in the TimelineDB and in the

2    multi-feed leaves.  In response they do not address that

3    evidence at all.  OK?  So if we have expert testimony saying

4    that it can only be disregarded for summary judgment if it is

5    completely conclusory, if it has no basis.  They don't address

6    that at all, they don't ask you to find that, and you can't

7    weigh that evidence.

8            In their reply they do not address our affirmative

9    evidence at all.  Instead, they say major life events, pages

10   liked, groups joined.  Right?  They point to several things

11   that they say came from TAO and UDB.  OK?  Those things are all

12   in the TimelineDB so let me explain.

13           Major life events.  Ms. Keefe told you that the way

14   major life events get into the system is you create them.  I

15   enter:  I got married on June 6, 1998.  I joined Russ August &

16   Kabat in 2003.

17           THE COURT:  Let me just ask you a question.

18           If, in fact, information goes to the TimelineDB but

19   it's not in the Timeline back-end or Timeline aggregator --

20           MR. FENSTER:  I think you misstated that.

21           THE COURT:  I'm sorry?

22           MR. FENSTER:  I think what you are intending to ask is

23   if it goes into the aggregator but doesn't get into the

24   TimelineDB.  Is that what you are asking?

25           THE COURT:  Well, it wasn't, actually, but go ahead.

M2S5mirA

1              MR. FENSTER:  So my --

2              THE COURT:  You were explaining how items get into the

3    TimelineDB.

4              MR. FENSTER:  I am explaining that --

5              THE COURT:  I had thought that the whole issue was

6    whether items in the Timeline back-end, including the timeline

7    aggregator, all are in the TimelineDB.

8              MR. FENSTER:  That is right.

9              So the TimelineDB is the main stream.  OK?  And what

10   they're asserting is something comes into the aggregator that

11   is not in the TimelineDB.  OK?  And what I am telling you, your

12   Honor, is that there is contradictory evidence about that, and

13   specifically --

14             THE COURT:  Go ahead.

15             MR. FENSTER:   -- specifically, your Honor, for major

16   life events, every one of those events was entered by a user

17   and that user action is recorded in the TimelineDB.  If I

18   enter:  *I got married on this date*, that's a user action and

19   that gets entered on the TimelineDB.  OK?  What they're saying,

20   all of the data units are in the Timeline database.  They're

21   saying that, well, we get it from TAO as a list and that list,

22   itself, is not in, but all of the individual data units are.

23   Major life events get created by users.  Any interaction with

24   the system by a user is recorded in the TimelineDB.  That is

25   our affirmative evidence that you have to accept for purposes

M2S5mirA

1    of summary judgment.

2          They tell you -- this is -- and, your Honor, this goes

3    to the credibility point, this will illustrate it right now.

4    For multi-feed -- this is from their summary judgment motion at

5    page 14 -- they say that the multi-feed aggregator receives

6    information from any sources, for example:  Friends, pages

7    liked, groups joined.  This information is not in the leaves.

8    OK?

9          This is a credibility point, your Honor.  They have

10   told you it is not in the leaves.  Now, their basis for saying

11   so they say is unrebutted declaration.  It is only the

12   declaration of Tang which is after close of discovery, not

13   citing a single document.  OK?  So it is an interested witness,

14   not citing any document, that they're saying you have to accept

15   such that no reasonable jury could find otherwise.

16         Your Honor, this is flatly inconsistent with the

17   evidence of record.

18         So Exhibit 27 to our opposition, OK, this is actual

19   evidence.  I'm not talking boxes, I'm talking evidence.  What

20   this says is in the leaves -- this is Exhibit 27, Facebook's

21   documents -- a user's friends, pages liked, and other actions

22   are stored in the leaves; flatly inconsistent with what they

23   represented to you was not in the leaves.

24         Now, Exhibit 30, this is their document saying

25   aggregator gets all the actions and objects from the leaves;

M2S5mirA

```
1    that's the leaves, that's the main stream that we are pointing
2    to.  These actions and objects are from your friends, pages you
3    follow, groups you have joined.  Right?  They have told you in
4    their papers and in court today that friends, pages liked,
5    groups joined, are not in the leaves, they come from TAO and
6    UDB.  The evidence that we have presented to you in the record
7    in opposition to summary judgment shows a clear question of
8    fact.  You cannot find on this record that no jury could find
9    otherwise.  That's what -- you accepted the representation last
10   time and the federal circuit reversed, for that reason.
11        THE COURT:  By the way, one of the great joys of being
12   a district court judge is we understand that whatever we do is
13   subject to review so I welcome review.  And the fact that there
14   was a reversal the first time doesn't affect the way in which I
15   look at the record now.  In fact, the federal circuit
16   specifically left open the possibility of another motion for
17   summary judgment after the record was complete and pointed to
18   specific issues that Facebook brought up too late.  So, the
19   fact that there was a reversal the first time is only an
20   invitation to complete the record and to look carefully at what
21   the federal circuit said the first time so that I carefully
22   follow it this time.  You seem to be using the decision by the
23   federal circuit for some other purpose.
24        MR. FENSTER:  Your Honor, my point in that is you told
25   us at the beginning of this case that if they wanted to move
```

M2S5mirA

for an early summary judgment their credibility is on the line
in doing so.  And, your Honor, what I was pointing out is that
they told you X, namely that information from TAO came into the
aggregators.  That was wrong.  It was contrary to the evidence.
You accepted their representation and the federal circuit
reversed.  I understand that that's a normal part of things --
that's exactly what happened.

THE COURT:  Go ahead.

MR. FENSTER:  My point, your Honor, is I am asking you
to have some healthy skepticism about what they're telling you
now because it is inconsistent with the evidence which you are
not allowed to weigh in a motion for summary judgment.  We have
presented affirmative evidence that everything that a user does
on the system is stored in TimelineDB and the multi-feed leaves
and I can take you through that evidence.  They don't respond
to that.  Instead, they say major life events, which are
created by users.  They say pages liked, groups joined are not
in the system.  The evidence shows that it is.  There is no --
so all of the evidence that they're talking about comes from
TAO and UDB and then there is co-efficient and I will talk
about co-efficient in a second.  OK?  They have not presented
unequivocal evidence that information comes from TAO into the
aggregator that is not already in TimelineDB.  In fact, the
evidence of record is that TimelineDB is a reverse
chronological index of what is in TAO.  So, your Honor, this is

M2S5mirA

cited in Exhibit 5 which is the Koskinen report at page 52,

this is Facebook Mirror Worlds 200314, slide 4:  TimelineDB is

just a reverse chronological index of what is in TAO.  That is

the evidence of record.  There is no evidence from which you

have to conclude that no reasonable juror could find otherwise

that information comes from TAO into the aggregator that is not

in TimelineDB.  The other source that they point to is UDB.

Your Honor, UDB, there is no evidence that information gets

from UDB into the aggregator.

So, let me show you exhibits 24 and 26.  This is

Exhibit 24 and this shows that the interaction between UDB and

Timeline is UDB sending information to TimelineDB, that actions

get written to both the UDB and Timeline.  There is no document

showing, connecting to, or supplying information to the

aggregator that is not already in TimelineDB.  The only person

who says that is Tang -- an interested witness -- without

citing any documents.

The record is such that you cannot accept that as

unequivocal such that no jury could find otherwise in the light

of contrary evidence.  The contrary evidence is Dr. Koskinen,

their documents, their witnesses that all say everything that a

user does, all data, units generated or received, are in the

TimelineDB and in the leaves.

For UDB, let me finish that point with Exhibit 26.

THE COURT:  Just so that I am clear, your argument is

M2S5mirA

1    that the information that Facebook is talking about goes

2    directly to the TimelineDB or the multi-feed leaves and is not

3    in fact in the Timeline back-end, the Timeline aggregator, or

4    the multi-feed system?

5            MR. FENSTER:  Yes, your Honor.  I am saying that there

6    is a disputed issue of fact as to whether the information that

7    they're talking about comes into the aggregator at all --

8    because that's contrary to their documents -- and it is

9    disputed whether that information that they're talking about is

10   also not in the leaves in TimelineDB because our documents and

11   evidence show that it is.

12           THE COURT:  OK.

13           MR. FENSTER:  And --

14           THE COURT:  But --

15           MR. FENSTER:  OK.  Go ahead.

16           THE COURT:  How can that be a definition of -- how can

17   that meet the definition of the main stream.  I thought the

18   main stream was to be the time-ordered accumulation of data

19   units that are contained in the computer system.

20           MR. FENSTER:  That's right.  So the TimelineDB is the

21   main stream that is a time-ordered chronological index of all

22   data units generated or received by the Timeline back-end and

23   the multi-feed leaves are a time-ordered index of all data

24   units generated or received by the multi-feed system.  So, just

25   to finish this point, this shows that the ranking information,

M2S5mirA

1    which is what Tang relies on, the stuff that he is talking

2    about, if you look at his declaration at paragraphs 10 and 12

3    he says that the information that he says comes from UDB is

4    used for sorting and ranking.  That ranking information is in

5    TimelineDB, according to their documents.  So that's what

6    Exhibit 26 shows.  You will notice that there is no line

7    between UDB and aggregator.  This is inconsistent with

8    Mr. Tang's declaration.  It is also inconsistent to say that

9    the ranking information from UDB is not already in TimelineDB.

10   This shows it is.  OK?  So we have a conflict of evidence;

11   that's what the jury is supposed to resolve, you are not

12   permitted to.

13            So --

14            THE COURT:  Go ahead.

15            MR. FENSTER:  So, with Koskinen, Koskinen's

16   declaration at paragraph 41 leave servers contain all the

17   action and objects generated or received by the multi-feed

18   system.  He says that they're in chronological order.  This is

19   at 40 to 42 and he cites all the documents supporting that.

20   OK?  We put in evidence that all data units generated or

21   received by the multi-feed back-end system are in the leaves

22   and those generated or received by the Timeline back-end system

23   are in the Timeline database.  That is affirmative evidence, it

24   is not merely conclusory, there is evidence to back it up.  The

25   only thing that's contrary is an unsupported interested witness

1   declaration that was created for this motion after the close of

2   discovery.  That doesn't cite any documents, it doesn't explain

3   away all of the documents that we have cited to the contrary.

4   That is a classic question.  We have met our burden to put in

5   evidence sufficient for a jury to find that every data unit

6   generated or received is in the Timeline database and in the

7   leaves by their respective systems.

8               THE COURT:  Could you address ad finder and EGO?

9               MR. FENSTER:  Yes.

10              So first ad finder and EGO are only relevant to

11  Newsfeed, they are not relevant to Timeline.

12              THE COURT:  Correct.

13              MR. FENSTER:  So, EGO has recommendations which are

14  used for sorting and ranking.  This is part of the query and

15  query information is not -- does not have to be stored as

16  part -- it is not a data unit and it is used to cut against the

17  main stream to generate the substream.  Queries do not have to

18  be stored and that's undisputed with their expert.

19              So this is our slide 27, this is Stephen Gray, their

20  expert, acknowledging that queries don't have to be stored in

21  order to constitute a main stream.  Queries are not data units,

22  queries, query information does not have to be stored to be

23  part of the main stream.

24              And, your Honor, under *PPG*, the federal circuit case,

25  the application of the facts to properly prove proper claim

M2S5mirA

1    construction is a question of fact for the jury.  Whether

2    queries are data units or not is a question for the jury.  That

3    is a fact question.  And the federal circuit essentially

4    recognized that -- and this is our slide 7.  This is at page

5    910 of the federal circuit's opinion in this case -- I'm sorry,

6    this is not -- this is where they recognize that we did submit

7    evidence.  Sorry.  I meant to refer to slide 28, your Honor

8    which is also page 910 of the federal circuit opinion which is

9    acknowledging that there is a question as to whether query

10   information comes within the relevant claim terms data units

11   under a proper construction.

12            THE COURT:  If --

13            MR. FENSTER:  They're not saying -- go ahead.

14            THE COURT:  It doesn't say that it is not a proper

15   item for the Court's construction on remand.

16            MR. FENSTER:  So, it is theoretically possible that --

17   your job is to do claim construction and then the jury -- it is

18   a fact question whether those -- whether the facts meet that

19   claim construction.

20            THE COURT:  You said that the federal circuit said it

21   was a fact question.

22            MR. FENSTER:  I said that the federal circuit

23   acknowledged that there was a question and I am asserting to

24   you that it is a fact question.  OK?  If you want to hold that

25   contrary to the intrinsic record that data unit is any unit and

M2S5mirA

1    that as a matter of law, even though the intrinsic record says

2    queries are not data units and their expert admits that queries

3    are not data units, if you want to hold that no reasonable

4    juror could find that queries are data units as a matter of law

5    and no reasonable jury could find otherwise, then we will go up

6    to the federal circuit on that.  I think that that's wrong,

7    your Honor.

8              THE COURT:  OK.

9              MR. FENSTER:  But I am acknowledging to you that the

10   federal circuit did not preclude it.

11             THE COURT:  Hold on.  I have already told you that one

12   of the joys of being a district court judge is anything that we

13   do is subject to review, so of course the parties are welcome

14   to ask the federal circuit to review anything that I do.

15             Go ahead.

16             MR. FENSTER:  I know, but I know you want to get it

17   right and I am trying to help you do so, your Honor.

18             So, I think that where we were with --

19             THE COURT:  Ad finder.

20             MR. FENSTER:  -- EGO and ad finder.  So ad finder

21   presents ads.  This comes down to whether they're data units.

22   Ads have no place in a user's diary unless the user interacts

23   with that ad.  If they do, it will be part of their timeline

24   and in their leaves.  If they don't interact with it, it has no

25   place in their Timeline, in their diary, because it is not of

M2S5mirA

1    interest to them, it is inorganic information.

2             THE COURT:  You don't dispute that information from

3    the ad finder goes to the multi-feed aggregator and doesn't

4    show up in the multi-feed leaves?

5             MR. FENSTER:  So unless a user -- if a user interacts

6    with the ad, if a user clicks through on an ad, that will

7    result in something being stored in the leaves but, if not, I

8    don't have evidence that the ads themselves, which we contend

9    are not data units and it's a fact issue as to whether they

10   are, we do not have evidence that those, otherwise, are stored

11   in the leaves.  That's true.

12            THE COURT:  Yes.

13            MR. FENSTER:  And that does not preclude summary

14   judgment here.  It does not warrant summary judgment because

15   there is a fact question as to whether those are data units in

16   the context of this claim, your Honor.

17            THE COURT:  OK.  What about EGO?

18            MR. FENSTER:  So EGO is just part of the query and

19   that's what I was addressing.  So query -- EGO has to do with

20   recommendations for sorting and ranking, like the information

21   from TAO and UDB that they talk about.  That ranking

22   information is in the database so there is a question of fact

23   as to whether those are in the leaves or in the TimelineDB.

24   And, in any event, there is a question as to whether that query

25   information is a data unit.  And again, those are specific only

M2S5mirA

1    to multi-feed.

2              THE COURT:  It only deals with Newsfeed, right?  EGO?

3              MR. FENSTER:  That's correct.

4              THE COURT:  So I understand your issue with respect to

5    query.  Other than that, do you dispute that there is

6    information from EGO that's in the multi-feed aggregator that

7    then doesn't appear in the multi-feed leaves?

8              MR. FENSTER:  Yes.

9              THE COURT:  You don't dispute that?

10             MR. FENSTER:  We do dispute that.

11             THE COURT:  Why is that?

12             MR. FENSTER:  The evidence for that is this is an

13   aggregation of information that's already in the TimelineDB or

14   in the leaves.

15             THE COURT:  I thought EGO relates only to the

16   Newsfeed.

17             MR. FENSTER:  You are right.  I completely apologize,

18   your Honor.

19             Yes; EGO only applies to Newsfeed and there is a

20   dispute as to whether it is drawing information or relating to

21   information that is already stored as data units in the leaves.

22   That is correct.

23             THE COURT:  What part of the record raises that

24   question?

25             MR. FENSTER:  So, Dr. Koskinen's declaration which

M2S5mirA

1    says all data units generated or received by the system are in

2    the leaves raises that question.  Moreover --

3              THE COURT:  He doesn't deal specifically with EGO,

4    does he?

5              MR. FENSTER:  He does not deal specifically with EGO

6    but what you have is inconsistent information.  So, one, there

7    is no -- so, we have overlapping information and the evidence

8    about EGO is not undisputed that it goes to aggregator and it

9    is not undisputed that what recommender consists of is not

10   already in the leaves.

11             THE COURT:  OK.

12             MR. FENSTER:  Just like major life events, just like

13   pages liked and friends, they tell you -- here what is

14   happening, your Honor.  There is -- where are your boxes?  What

15   they tell you is that major life events, when I got married,

16   when I started work, when I had a kid, is not in the leaves.

17   OK?  And this is true with pages liked.  It is true with a lot

18   of the information that they point to.  Here is what's

19   happening.

20             When I got married is in the leaves.  When I had a kid

21   is in the leaves, and when I started work is in the leaves.

22   Each of these data units are in the leaves.  What they get from

23   UDB, they say -- again, it is disputed in the record -- what

24   they get is a list of these three things and they say that list

25   comes from UDB and that list, as a list, is not in the leaves.

M2S5mirA

```
 1    The data units themselves are undisputedly in the leaves or it

 2    is undisputed that there is record evidence that they are in

 3    the leaves.  So that's what's happening here and that's what's

 4    happening with EGO as well.  The recommender is pulling

 5    information of data units that are in the leaves.  The life

 6    events are data units that are in the leaves.  The pages liked

 7    the friends, the groups joined, are all data units that are in

 8    the leaves already, and what they're telling you is, well, but

 9    I got it as a list from this other source and I'm going to use

10    that for sorting and ranking as part of my query and therefore

11    we don't infringe.  But every item that is on that list is in

12    the leaves and in the relevant system and in the TimelineDB.

13            So that's what's happening, your Honor.  They're

14    trying to distract you from our evidence that says the data

15    units are in the leaves and in the TimelineDB, and because they

16    get it in an organized way from someplace else and that

17    organized list is different -- or they say it is different --

18    it is not, and that's a fact question for the jury.

19            THE COURT:  OK.  Finish up.

20            MR. FENSTER:  Your Honor, so we haven't talked about

21    main collection.  The '439 and the '538 patents -- I'm sorry.

22            THE COURT:  Finish up, please.

23            MR. FENSTER:  So, your Honor, the claims that require

24    main collection is the '439 patent.  The '439 patent does not

25    include main stream.  Instead, it has main collection.  There
```

M2S5mirA

is a question of claim construction for you that you are

required to find in order to grant summary judgment and that

is --

          THE COURT:  I understand.

          MR. FENSTER:    -- because main stream is defined

lexicographically.  So the general claim construction principle

is you can't limit a claim unless there is lexicography or

clear and unmistakable disclaimer.  With main stream there is a

lexicographic definition, there is not such lexicography and no

such disclaimer with respect to main collection.  And

therefore, while main stream is required to have every data

unit generated or received by, in time-ordered collection, a

main collection is not.  It is not engrafted with those

limitations because there is no clear and unmistakable

disclaimer and no lexicography so limiting main collection.

Instead, it needs to be given its plain and ordinary meaning

and under its plain and ordinary meaning it is not required to

have every data unit generated or received by in time-order.

So, under proper construction of main collection, which the

federal circuit acknowledged is still open to your Honor and

has not previously been decided, summary judgment is not

warranted under the '439 in any event under main collection.

          The last point, your Honor is glance view.  I just

want to clarify, Facebook misunderstood and mischaracterized

for your Honor our glance view representation.  Glance view is

M2S5mirA

1   their "hover over" feature.  When you hover over certain links

2   or member pages it does give a glance view or a preview of that

3   member page or that page and we have some examples that we can

4   hand up to the Court.

5          THE COURT:  No, I understand.

6          MR. FENSTER:  I'm sorry, your Honor?

7          THE COURT:  I said I understand.

8          MR. FENSTER:  OK.  Unless you have any other

9   questions, I will sit.  Thank you, your Honor.

10          THE COURT:  All right.

11          MS. KEEFE:  Thank you, your Honor.

12          THE COURT:  Ms. Keefe, you may proceed.

13          MS. KEEFE:  Very briefly, your Honor.

14          We don't dispute that, for example, you saw this page.

15   This page said aggregator gets actions and objects from leaf.

16   These actions and objects are from your friends, the actions

17   and objects are from pages you follow, the actions and objects

18   are from groups that you have joined.  We do not dispute that.

19   If we go back to my boxes, your Honor will recall that I

20   absolutely admitted that user actions go into the Timeline.

21   User actions, the clear boxes, go into the leaves.  That's all

22   those documents say.  All those documents say the user actions

23   go there.  Everything that I was telling you didn't show up in

24   the TimelineDB were things that weren't user actions, things

25   like ads, things like the pages you have joined.  What

M2S5mirA

1    Mr. Fenster is saying is if I like the page, it shows up in the

2    NewsfeedDB because it is a user action.  The user action

3    certainly does, but a list of all the pages that I have ever

4    joined, a list of all the groups that I have ever liked or

5    anything like that, that's not ever stored in the TimelineDB

6    and that's what we are being very careful to show your Honor.

7            As regards the major life events from Timeline, we

8    actually have unrefuted deposition testimony, deposition taken

9    by plaintiffs where the witness specifically addressed this

10   issue.  Major life events is very different from simply

11   clicking on something or putting up a post.  If you put up a

12   post, Facebook has two ways to kind of put information into its

13   system.  One way is a post.  I could write a post that said,

14   *Hey, I got married today.*  That would show up in the Timeline

15   database because that's an action.  There is a completely

16   separate flow called major life events.  If you use the

17   separate flow for major life events those are absolutely not

18   stored in TimelineDB.  Let me find you -- it is in Mr. Tang's

19   deposition.  This is Mr. Tang's deposition at page 83:

20   "Q  You mentioned something called major life events.  What are

21   you referring to?

22   "A  Major life events is a type of content you can create on

23   Facebook.  For example, you may say you started a new job, you

24   attended a new school.  It actually allows customization.

25           And then he goes on to say:  That was not -- we don't

M2S5mirA

1    publish that data to Timeline but store it in TAO.

2              He gets asked later in the deposition specifically

3    about if you just entered a life event, is that the same thing?

4    And he says, no, feed stories are different.  A feed story is

5    not the same as a life event.  They're not the same thing.

6              Mr. Fenster was conflating the two together but

7    they're not the same thing.

8              THE COURT:  Major life events are from the UDB?

9              MS. KEEFE:  That's correct, your Honor.  Absolutely.

10             In terms of whether or not a query or other

11   information from EGO that can be used to curtail, all of those

12   are data units, all of that is information that is received by

13   the aggregator.  The thing that I had showed you earlier today,

14   your Honor, to support or position on the breadth of the term

15   data unit, in the original prosecution -- you saw this earlier

16   today -- there was an interview.  During the interview it was

17   agreed that applicants would refine the claim language in the

18   direction of addressing that stream of documents in the

19   broadest sense that are of significance to the user and which

20   thus determines the events of direct user interest in the

21   timeline of a computing system, without regard to whether their

22   generation is external or internal.

23             In response to that demand by the patent office the

24   patent owner said:  Primarily, among other amendments discussed

25   more fully below, applicants have amended the claims to recite

M2S5mirA

1   the stream of documents, data units of significance to the user

2   in the broadest sense by reciting –– and here comes the claim

3   language that they says take care of that edict –– each data

4   unit received by or generated by the computer system is

5   received by the main stream.  In other words, all the data

6   units, without regard to whether a data unit was generated

7   internally or externally, are of significance to the user.  So

8   it gets rid of the subjective component completely.  And then,

9   as your Honor already knows, data unit and document are

10  described together and very broadly.

11         So, your Honor is right in terms of the breadth that

12  is applied and the ––

13         THE COURT:  By the way, what is your position with

14  respect to patent prosecution disclaimer in the Covered

15  Business Method proceeding?

16         MS. KEEFE:  So under *Aylus*, your Honor, it absolutely

17  has to be taken into account.  Mr. Fenster is saying, *But I'm*

18  *aloud to talk out of one side of my moth with the CBM and come*

19  *back to the District Court and say something else because there*

20  *is a different standard.*  The problem is *Aylus* issued at the

21  time when both of those standard existed and *Aylus* didn't care.

22  *Aylus* says what you say matters because the public is allowed

23  to rely on statements made by patent owners in order to obtain

24  their claims.  These were statements they made in order to

25  preserve the validity of their claims.  They're not allowed to

M2S5mirA

1    say, OK, so for this proceeding I kind of think black means

2    white.  The whole public now relies on that record regardless

3    of what standard it was.  The public now understands that

4    that's what the patent owner understands its patent to be.

5    *Aylus* says no matter the standard, you don't get to come back

6    down and change your mind because the public can rely on

7    statements you made in order to obtain affirmance of your

8    patent.  And *Aylus* is at the time when the CBM standard had

9    "broadest reasonable."  That's changed not that recently, a

10   couple years ago, to now say there is only one standard, but

11   *Aylus* was at that time so his distinction doesn't work, your

12   Honor.

13          THE COURT:  As I understand Mirror Worlds' argument

14   today is there is information in the multi-feed leaves and in

15   the TimelineDB that never goes through the respective

16   aggregators.  It is there in the main streams but not in the

17   computer system.

18          MS. KEEFE:  I don't understand that argument, your

19   Honor, because it is not true.  The only thing that exists in

20   the Timeline database or in the leaves are the user actions.

21   User actions are not everything that happens on Facebook.  It

22   is not everything that comes through the system.  Ads

23   definitely go through the aggregator and never touch the leaves

24   or the TimelineDB.  Information from EGO definitely goes to the

25   aggregator and never touches TimelineDB or the leaves.  I don't

M2S5mirA

1    understand his statement that there are things that are in the

2    leaves that never pass through or never were part of the

3    system.  I don't think that's what he said.

4              THE COURT:  I think it is.

5              MS. KEEFE:  Then there is no evidence of that, your

6    Honor.  There is absolutely no evidence.  The only evidence --

7              THE COURT:  There are some exhibits like Exhibit 24

8    that were relied on in the papers and again in argument that

9    show charts, that show information going directly to the

10   TimelineDB or the multi-feed leaves.

11             MS. KEEFE:  I understand.

12             If your Honor is talking about one of the last charts

13   he put up from Exhibit 24 where information flows UDB, async,

14   Timeline and doesn't show another flow to the aggregator, these

15   are not the only way these systems work.  Every one of these

16   documents is describing a path flow.  Here is what happens when

17   some information goes this way or goes that way.  That's why --

18   there is nothing in here that precludes information from

19   another path flow, this is just one of the path flows.  For

20   example, the one he showed a few minutes ago that showed some

21   ranking data was given from UDB down into the timeline that

22   does not preclude other ranking data from also going into the

23   aggregator, nor from other information like co-efficient coming

24   from UDB into the aggregator.  Absolutely not.  And those

25   documents very carefully limit themselves to the flow that

M2S5mirA

1    they're talking about.

2         What we have is unrebutted testimony.  The deposition

3    of Tang where he specifically describes major life events

4    happened before expert reports and yet that's nowhere in

5    Koskinen's expert report, there is no refutation of that fact.

6         THE COURT:  How do I deal with the contrary

7    conclusions of Dr. Koskinen?

8         MS. KEEFE:  Dr. Koskinen, if you look carefully at

9    Dr. Koskinen's expert report, he never says everything is

10   there.  He says all of the actions, all of the user actions are

11   there.  He uses the language that is accurate.  All user

12   actions show up in the leaves, all user actions show up in the

13   TimelineDB.  He is careful.  He made sure that that's what he

14   said shows up.  Now, he goes a step beyond that and says it's

15   all data units because he has a different understanding of a

16   data unit having to be something of interest, having all of

17   these other restrictions put on it, but he is very careful that

18   it is user actions and we do not dispute that, our documents

19   say that, we stand behind it.  Everything that we are telling

20   you shows up in the aggregator that doesn't show up in either

21   the database or the leaves is not a user action.

22         THE COURT:  OK.

23         MS. KEEFE:  If your Honor doesn't have any other

24   questions on non-infringement, I just wanted to exceedingly

25   briefly touch on 101 and remind your Honor that it has to be

M2S5mirA

about what is in the claims, and I would again point your Honor

to the *Berkheimer* case. You asked what is this technological

improvement. I don't think you got a very specific answer but

even if you did, you got an answer like, but you have to look

at the spec, you have to look at the Gestalt. *Berkheimer* makes

absolutely clear that even if you look at the spec to

understand what is happening or what the gist of the claim

might be for the extraction, you cannot import the inventive

step from the specification, you cannot import anything else,

it is about the claims. And that's what *Berkheimer* does. The

broader claims were invalid as drawn to an abstraction. The

narrower claims that said but if I store non-redundant data I

can improve the computer were valid. There is just nothing

like that here. So, would ask your Honor to look back at

claims, there is nothing in them that improves a computer

system, despite what the specification may say they wish would

happen.

       THE COURT: All right. Thank you.

       MS. KEEFE: Thank you, your Honor.

       MR. FENSTER: Your Honor, may I just?

       THE COURT: Very briefly. And then Facebook will have

an opportunity to respond. So, go ahead.

       MR. FENSTER: First of all, Dr. Koskinen does say

every data unit generated or received by and he says this for

both Timeline and the leaves. Exhibit 35, among other things,

M2S5mirA

1    identifies everything related to you is in the Timeline.  I

2    showed you other evidence that TAO is a reverse chron index --

3    or TimelineDB is a reverse chronological index of everything in

4    TAO.  I showed you evidence that UDB does not go to aggregator

5    but does go to the TimelineDB.

6          Now, you asked a question:  Can information get into

7    the TimelineDB or into the leaves separately from the

8    aggregator?  Absolutely yes.  We haven't talked about it much

9    yet but the evidence in the record that we have submitted as

10   part of Koskinen's declaration shows a separate write path -- a

11   separate write path.  Things get written to the TimelineDB and

12   written to the leaves through this separate write path that

13   does not go through aggregator, so it is.  what I told you is

14   absolutely true and their documents show that, that the write

15   path is separate and that information in the leaves, there is

16   information stored in the leaves and information stored in

17   TimelineDB that does not go through aggregator and that is all

18   supportive of Dr. Koskinen's declaration and the evidence that

19   we have submitted that every data unit generated or received by

20   those back-end systems is stored in the leaves for the

21   multi-feed and TimelineDB for Timeline back-end.

22         Regarding the *Aylus* case and the broadest reasonable

23   interpretation, your Honor, there is case law that acknowledges

24   the difference between the broadest reasonable interpretation

25   and the District Court standard.  I don't believe that we have

M2S5mirA

1    cited it to you but there is case law post-*Aylus* because that

2    happened right at the time of the switch.  There is case law

3    recognizing that statements about a BRI are not disclaimer for

4    the District Court standard claim construction and if you would

5    permit us we can, by tomorrow evening, give you one page with

6    the citations to that case law that recognizes the difference

7    between broadest reasonable interpretation and the district

8    court claim construction and that statements made in a BRI

9    context are not disclaimer in the district court context.

10           THE COURT:  Is there a federal circuit case that says

11   that the *Aylus* holding does not apply to statements made in a

12   CBM proceeding?

13           MR. FENSTER:  Your Honor, if you will give us 24 hours

14   I will address that question for you.

15           THE COURT:  Sure.

16           MR. FENSTER:  I am not prepared to do that right now.

17           THE COURT:  Sure.  And Facebook can do the same.

18           MR. FENSTER:  Yes.

19           THE COURT:  Go ahead.

20           MR. FENSTER:  If you would permit us until Wednesday

21   that would be better.  If not, we can do it by Tuesday.

22           THE COURT:  No, tomorrow would be better.

23           MR. FENSTER:  OK.  We will do so.

24           That's all I had on non-infringement.

25           MR. WANG:  Your Honor, may I read just a few sentences

M2S5mirA

1   from *Berkheimer* and then that's it on the 101 issue?

2          THE COURT:  Sure.

3          MR. WANG:  In *Berkheimer*, your Honor, the federal

4   circuit reversed a finding of summary judgment.  So, for

5   certain claims that were asserted they said that there were

6   disputed issues of fact.  And what they say at the end of their

7   decision, there is at least a genuine issue of material fact in

8   light of the specification regarding whether claims 4 to 7

9   archive documents in an inventive manner that improves these

10  aspects of the exposed archival system.

11         So, your Honor, there is a federal circuit

12  acknowledging a question of fact relying on the specification.

13  Specification is entirely fair game for you, your Honor, to

14  determine what is really -- what these claim are really about,

15  your Honor.

16         THE COURT:  It was a step two analysis.

17         MR. WANG:  That was a step two analysis there in

18  *Berkheimer*, your Honor.

19         THE COURT:  OK.

20         MR. WANG:  Thank you.

21         THE COURT:  Ms. Keefe?

22         MS. KEEFE:  The only thing I wanted to say, your

23  Honor, is I didn't understand the point that Mr. Fenster was

24  making.  If he and your Honor were asking me can information go

25  into the TimelineDB or the leaves, not into aggregator; sure.

M2S5mirA

 1   But that is of no moment because what matters is whether or not

 2   there is something that's not in those leaves that's in the

 3   computer system.  That's the only thing.

 4            THE COURT:  No.  You mean whether there is something

 5   in the computer system that's not in the TimelineDB or the

 6   leaves?

 7            MS. KEEFE:  Exactly.

 8            THE COURT:  Yes.

 9            MS. KEEFE:  That's it, your Honor.

10            THE COURT:  I thought you had it reversed.

11            MS. KEEFE:  Yes.  Absolutely.

12            THE COURT:  OK.  All right.  Thank you, all.  I will

13   take the motion under advisement and the parties are welcome to

14   give me a case or cases by tomorrow from the federal circuit

15   which attempt to limit *Aylus* to an *inter partes* proceeding and

16   not to a CBM proceeding.

17            There has been a lot of briefing on the current motion

18   and so I don't need subsequent argument letters going over

19   everything that you have given me before the argument today.

20   There is a specific issue, Mirror Worlds asked for an

21   opportunity to submit a case or cases on that, and so you are

22   both welcome to do that by close of business tomorrow.

23            Thank you, all.  I appreciated the briefs.  I

24   appreciated the argument.  Thank you, all.  Thank you all for

25   coming in, too.  As I made it clear, I would have been

M2S5mirA

1    perfectly happy to listen to all of you by video.  You have all

2    gone through great pains to be here today and so I appreciate

3    that.

4            Thank you, all.

5            MR. FENSTER:  Thank you, your Honor.

6            MS. KEEFE:  Thank you, your Honor.

7                              oOo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25